**Ashley ERVIN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–08–00121–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 11, 2010.

Discretionary Review Refused Dec. 15, 2010.

Leora Teicher Kahn, Attorney at Law, Houston, TX, for Appellant.

Jessica A. Caird, Assistant District Attorney, Houston, TX, for Appellee.

Panel consists of Justices KEYES, ALCALA, and HANKS.

## OPINION

ELSA ALCALA, Justice.

Appellant, Ashley Ervin, appeals from a judgment convicting her for the capital murder of Brady Davis. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp.

2009). Appellant pleaded not guilty to the jury. The jury found her guilty, and, because the State did not seek the death penalty, punishment was automatically assessed at life imprisonment without parole. *See id.* § 19.02(b)(1) (Vernon 2003), § 19.03(a)(2) (Vernon Supp. 2009). In seven issues, appellant challenges the legal and factual sufficiency of the evidence to sustain the conviction and the trial court's admission of her three statements made to the police, which she claims were made in violation of *Miranda v. Arizona,* 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). We conclude that the evidence is legally and factually sufficient; that the trial court properly admitted the first two statements because statutory warnings were not required for appellant, who was not in custody; and that the court properly admitted the third statement that was made following waiver of *Miranda* warnings because the evidence fails to show that the officers deliberately employed a two-step interrogation technique to circumvent *Miranda.* We affirm.

## Background

On May 25, 2006, while she was walking from the bus stop near her house at around 5:30 a.m., Mary Ann Crutcher was approached by a man in a hoodie threatening her with a semi-automatic gun. He ran from her when she refused his demand to give him any money and jewelry. About an hour after this attack, Davis was two blocks away at a carwash cleaning his barbeque pit. He was shot and killed with a semi-automatic gun that used .380 caliber ammunition. When she learned about his death, Davis's wife noticed that his cell phone was missing. Houston police officer A. Brown was assigned the Davis case, but he did not have any information about who committed the offenses.

One month later on June 23, officers with the homicide division of the Houston Police Department were working together to solve a missing persons report concerning the disappearance of Maria Aparece and Huy Ngo, an offense that occurred three weeks after the Davis murder. Officers Arnold and Termuelen were attempting to locate Keithron Fields to execute a "pocket" arrest warrant for him for that case. The officers did not have a warrant for appellant, and she was not a suspect. Because Keithron was dating appellant, Officers Arnold and Termuelen tried to locate him at appellant's house, where she lived with her mother, Serena Hawkins. Keithron was not at the house at 3:00 p.m. Hawkins, however, told the officers that appellant drove a black Nissan and worked at McDonalds at Deerbrook Mall.

At 4:30 p.m., Officers Arnold and Termuelen, who were in plain clothes, went to the McDonalds at the Deerbrook Mall, where they found appellant working the front cash register. They asked her if she would come with them because they were conducting an investigation. She was "very polite" and agreed. The officers asked appellant about her car because they believed a black vehicle may have been used in the Aparece and Ngo offense. When appellant showed them her black car, they asked for consent to search it, and she agreed.

At 5:40 p.m., while she was at the mall parking lot, appellant signed a written consent allowing officers to search her black Nissan Sentra. The officers had the car towed to the police department's fingerprint stall. The keys to the car went with the car when it was towed, and officers could not recall whether her house keys were on the same ring with her car keys that went with the car.

Officer Arnold asked appellant if she "minded" coming to the police station to

give a statement. She agreed. But having agreed to allow the officers to tow her car, appellant needed a ride to the police station to give her statement. She rode to the station in a marked patrol unit because no one with an unmarked car from the homicide division was available to drive her to the station, and Officer Arnold still had work in the field to complete. Appellant left the mall in the patrol car shortly after she signed the consent form. She was not in custody, was not handcuffed, and was free to leave if she wished, though she would have had to ask the officer to let her out of the car because the car did not have door handles inside the passenger compartment.

When she arrived at the police station, she began speaking to Sergeant Motard at about 6:00 p.m. Sergeant Motard was asked by Officer Miller, who was investigating the Aparece and Ngo case, to speak to appellant. Appellant was not handcuffed, was not in custody, and was told by Sergeant Motard that "she was not under arrest and she was free to go anytime she wanted to." He explained that he did not read *Miranda* warnings to her because she was not in custody and he did not view her as a suspect. He questioned her because she was the girlfriend of one of the suspects, and her car may have been involved in the Aparece and Ngo case.

At first, Sergeant Motard spoke to appellant in a conference room near his desk, but then they moved to his cubicle to type the statement on his computer. Appellant was 17 years of age, had completed 12 years of formal education, and was to begin her senior year of high school that fall. Before he started speaking to her, Sergeant Motard offered her food, a drink, and the opportunity to go to the restroom. Appellant declined all the offers.

Appellant was cooperative as she spoke to Sergeant Motard about the Aparece and Ngo case. Appellant revealed that she had a relationship with the people who were suspected of committing the Aparece and Ngo offense. Appellant was dating Keithron; was the cousin of Tim Randle; was the "distant cousin" of Alvie Butler; and was friends with Dexter Johnson, who in the past had lived near her. Appellant's first written statement described her mere presence at the capital murder of Aparece and Ngo committed by Tim, Alvie, Keithron, and Dexter, when they were all in her black car with her as the passenger. Tim, the driver of her car, dropped off Dexter, Alvie, and Keithron, who approached a blue car. After a few minutes, she saw Dexter driving the blue car, with Alvie in the back seat and Keithron in the front passenger seat. Tim followed the blue car to a wooded area near a park. Dexter pulled into the woods, got people out of the blue car, and took them to the woods. Appellant then heard two gunshots, with a small pause between the shots. Dexter and Keithron drove away in the blue car with Tim following them in appellant's car with her as the passenger. Dexter told appellant he shot the people in the head. Appellant then went with the men to Keithron's apartment. When she completed making her statement, appellant signed it before a notary, representing that it was true and correct to the best of her knowledge.

After appellant finished making the first written statement, Sergeant Motard discussed appellant's version of events with other officers to see if it was consistent with what the officers had learned from speaking to other people who had given information about the Aparece and Ngo case. Because he thought the "same crew" that committed the Aparece and Ngo crime could be involved in the Davis case, Officer Brown asked Sergeant Motard to ask appellant about the unsolved

Davis case. This was a "fishing expedition," according to Sergeant Motard. When appellant acknowledged she had some information about the Davis case, Sergeant Motard decided to take a written statement from her about that case.

In the second written statement, appellant acknowledged that three weeks before the Aparece and Ngo offense, she was with Dexter and Keithron when they committed two other offenses on one night and early morning. Appellant stated that when Keithron tried to take money from a lady at a bus stop, appellant was in the passenger's seat while Dexter drove her car. After that, appellant became the driver of her car. She drove Dexter and Keithron to a carwash knowing they were going to rob someone there, left them there, and picked them up after she heard a gunshot. Appellant's written description of the events in the Davis case stated,

> About three weeks ago, Dexter, Keithron, and I had been out all night. Dexter was driving and I was in the back seat. Keithron was in the front seat. Toward morning, I fell asleep on the back seat while they were driving around. Sometime around mid-morning, I heard the passenger car door slam and awoke to see Keithron getting back in the car. He was wearing a hoodie jacket and the hood was on his head. Keithron told Dexter the woman didn't have any money and we drove off. We were in the neighborhood called Northwood Manor. Dexter drove around on the streets looking for someone to get money from. Apparently, there was no one to get money from so Dexter stopped and let me drive. Dexter got in the back seat.
>
> I started driving on Homestead toward Keithron's apartment in Humble. I stopped at the light on Homestead and Hartwicke and there was a carwash on the corner with a man washing a large truck. *Dexter said, "Let us out here[.]" Dexter and Keithron got out of my car. I knew they were going to rob someone in the carwash.* I turned down around and turned [off] Homestead onto Guadalupe. *I drove around for two or three minutes. During that time I heard one gunshot. It was loud and came from the direction of the carwash.* I pulled back onto Guadalupe and saw Dexter and Keithron standing in the street. They had their black hoodies on with the hood up and they were holding their black bandana masks. *I stopped the car and the[y] both got in.* Dexter and Keithron got into the car and they were out of breath like they had been running. . . . *I drove on to Keithron's house and we went inside . . . .*

(Emphasis added). Appellant said that Dexter and Keithron explained to her that they had shot the man at the carwash because the man elbowed Dexter in an attempt to run away. According to Sergeant Motard, the first time he learned that appellant was the driver in the Davis case was when she told him during the time he took the second statement from her, and it was at that point that he first felt she could be "possibly culpable."

The remainder of the second statement by appellant described the weekend of June 10 when Keithron borrowed her car and later told her the car had been stolen. The recovery of her car ultimately led to it being towed to the police station. When the officers towed the car, they found marijuana and a firearm in the car, but missed finding a .380 firearm that was under the back seat. After recovering the car from the police impound, appellant's cousin Tim took a .380 firearm out of the car and gave it to Dexter. This evidence showed that appellant knew that Dexter had the same caliber gun that was used to kill Davis. At

the end of this written statement, appellant represented that the statement she made was true and correct to the best of her knowledge, and swore to its contents.

After she made the second written statement, appellant was told that Dexter, who had been speaking to Officer Abbondondalo, wanted to speak with her if she wanted to speak to him. Appellant walked alone from Sergeant Motard's cubicle to Dexter, who was at Officer Abbondondalo's cubicle. Dexter and appellant spoke privately for several minutes before she returned to Sergeant Motard's cubicle. When she returned to the cubicle, she appeared teary eyed and emotional. Sergeant Motard believed she was upset about "everybody's circumstance that are her friends." Sergeant Motard and Officer Abbondondalo drove appellant home at around 10:30 p.m. or 11:00 p.m. and told her mother that appellant was hanging out with some bad guys and needed to stop doing that.

The next day, June 24, the officers discussed the crimes and realized there was a discrepancy between appellant's statement, who said Alvie and not her brother, Louis Ervin, were at the murders of Aparece and Ngo, and the statements by Tim, Alvie, and Dexter, who said Louis was a participant. Sergeant Motard was not sure whether appellant's version was correct or whether the statements by the men were correct.

At 12:45 p.m., Sergeant Motard, Officer Brown, and Officer Abbondondalo went to appellant's house and saw a large group of people there. Appellant agreed to return to the police station to clarify her earlier statements. She changed clothes and then rode to the police station in an unmarked Ford Taurus. While walking to the interview room, Sergeant Motard mentioned the discrepancy about whether it was Louis or Alvie who was present at the Aparece and Ngo capital murder. Appel-

lant acknowledged the mistake, stating it was Louis. She then agreed to make another statement. This time, Sergeant Motard used a tape recorder to document the statement because that method was easier for him. Sergeant Motard read appellant her rights, explaining in his trial testimony that he did so "just as a precaution." Appellant waived her rights. Appellant was offered food and a drink. She was allowed to use the restroom upon request and, according to the officers, was not in custody. The third statement, which began at 1:20 p.m. and lasted about eight minutes, repeated the contents of the first and second statements in that all the statements concern the same subjects, the capital murder of Davis, and the capital murders of Aparece and Ngo.

In the third statement, the recording documented Sergeant Motard reading appellant her rights and her waiver. He reminded her that last night she was at the police station, not under arrest, and had made some statements. He stated that it was his understanding that she wanted to change her statements from the previous night in order to correct some of the names of people she spoke about. In discussing the case about the man at the carwash, appellant acknowledged that she drove the car and was with Keithron and Dexter. He asked her to finish in her own narrative about what happened. She stated she was asleep in her car with Dexter driving. She awoke when she heard Keithron slam the car door after returning from a robbery of a woman. She said Keithron stated the lady did not have any money so he threw away her wallet. Sergeant Motard asked if the lady was shot. Appellant said the lady was not shot. Sergeant Motard asked if this was when she became the driver instead of Dexter. Appellant said "yes." Appellant said that she drove the car back towards Humble. At

some point, near the Homestead intersection, Dexter and Keithron asked to be let out and she complied. She let them out near a carwash. Dexter and Keithron had guns in their hands, and put on black bandanas and hoodies after they got out of the car. Appellant drove, turned down a new street, heard a shot, and then turned back around to drive back towards the carwash. As she drove back, she saw Dexter and Keithron in their hoodies standing in the middle of the street flagging her down. She picked them up and they returned to Keithron's house. She stated that Dexter told her the man in the carwash elbowed him in an attempt to get away and that was why he shot him. She stated Keithron later confirmed this story to her. No money was taken from the man. After they returned to Keithron's house, Dexter was very interested in watching the news to see what had happened to the man he shot.

When appellant finished making the statement, she was shown where her family was located in the family room at the police station. Louis, her brother, had also arrived and was speaking to a police officer. Appellant was not in handcuffs or in custody when she returned to be with her family.

The officers spoke to an assistant district attorney about whether charges would be accepted on appellant. When a judge signed a probable cause warrant for appellant, Sergeant Motard told appellant about the charge, and she left the family waiting area to walk with him back to his cubicle to await a patrol officer. A patrol officer handcuffed appellant and took her into custody after that.

Appellant filed a written motion to suppress, which was litigated prior to trial before the jury. Officer Arnold and Sergeant Motard testified, as well as appellant and her mother, Hawkins. Appellant said she believed she was in custody when she consented to the search and made the statements to the police. Hawkins said she was not allowed to go with the officers to speak to appellant when they initially went to the McDonalds and that appellant did not answer her cell phone when Hawkins called her. During cross-examination, Hawkins acknowledged she had previously been twice convicted of felonies. The trial court denied the motion to suppress, making findings of fact and conclusions of law to support the ruling.

At trial, redacted portions of the three statements were admitted into evidence. Appellant presented no evidence in her defense. The jury charge allowed the jury to convict appellant as a principal actor, or as party by aiding in the capital murder, or as a party as a conspirator.

### Sufficiency of the Evidence

In her fifth and seventh issues, appellant contends the evidence is legally and factually insufficient to sustain her conviction because the evidence failed to show that she entered into a conspiracy with Dexter and/or Keithron to commit robbery, that Dexter or Keithron shot and killed Davis in furtherance of the conspiracy, and that she should have anticipated the killing of Davis as a result of carrying out the conspiracy. We determine that the evidence shows appellant's guilt as a conspirator under the law of parties.

### A. Legal and Factual Sufficiency

In a legal sufficiency review, we consider the entire trial record to determine whether, viewing the evidence in the light most favorable to the verdict, a rational jury could have found the accused guilty of all essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Williams v. State*,

235 S.W.3d 742, 750 (Tex.Crim.App.2007). We "may not re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the [factfinder]." *Williams,* 235 S.W.3d at 750. We give deference to the responsibility of the factfinder to fairly resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from the facts. *Id.*

Evidence is factually insufficient if, when all the evidence is examined neutrally, (1) the evidence supporting the conviction is "too weak" to support the factfinder's verdict or (2) considering conflicting evidence, the factfinder's verdict is "against the great weight and preponderance of the evidence." *Laster v. State,* 275 S.W.3d 512, 518 (Tex.Crim.App.2009). In reviewing the factual sufficiency of the evidence, we should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility. *Lancon v. State,* 253 S.W.3d 699, 705 (Tex. Crim.App.2008). The jury may choose to believe some testimony and disbelieve other testimony. *Id.* at 707.

■ Although appellant challenges the admission of her statements, we address that matter separately from our analysis of the sufficiency of the evidence. "It is well-settled that in reviewing evidence sufficiency claims, the appellate court must consider all of the evidence presented, whether properly or improperly admitted." *Fuller v. State,* 827 S.W.2d 919, 931 (Tex. Crim.App.1992).

### B. Capital Murder Under Conspiracy Theory of Law of Parties

A person commits capital murder if she intentionally or knowingly causes the death of an individual and intentionally commits the murder in the course of committing or attempting to commit robbery or aggravated robbery. TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(2); *Sholars v.*

*State,* 312 S.W.3d 694, 702–03 (Tex.App.-Houston [1st Dist.] 2009, pet. ref'd). A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another, or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. TEX. PENAL CODE ANN. § 29.02(a) (Vernon 2003); *Sholars,* 312 S.W.3d at 702–03. Aggravated robbery is robbery with the use or exhibition of a firearm. TEX. PENAL CODE ANN. §§ 29.02, 29.03 (Vernon 2003); *McElhaney v. State,* 899 S.W.2d 15, 17 (Tex.App.-Tyler 1995, writ. ref'd). A firearm is a deadly weapon. TEX. PENAL CODE ANN. § 1.07(17) (Vernon Supp. 2009).

■ "[I]ntent to kill may be inferred from the use of a deadly weapon, unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon." *Sholars,* 312 S.W.3d at 703; *Dominguez v. State,* 125 S.W.3d 755, 761 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd) (holding evidence permitted inference of intent to kill when defendant and other members of his gang planned to rob person walking alone at night, and, in course of theft or attempted theft of complainant, defendant retrieved loaded shotgun from car trunk and shot complainant in abdomen, resulting in complainant's death). Intent may also be inferred from the means used and the wounds inflicted, and is a factual matter to be determined by the jury from all the facts and circumstances in evidence. *See Hemphill v. State,* 505 S.W.2d 560, 562 (Tex.Crim.App.1974). "When a deadly weapon is fired at close range, and death results, the law presumes an intent to kill." *Sholars,* 312 S.W.3d at 703.

■ Under the law of parties, the jury could have found appellant guilty of capital murder if it concluded that the murder was committed in an attempt to carry out a conspiracy to commit aggravated robbery with a deadly weapon, and, though appellant had no intent to commit the murder, it was committed in furtherance of the unlawful purpose and should have been anticipated as a result of the carrying out of the conspiracy. TEX. PENAL CODE ANN. § 7.02(b) (Vernon 2003); *Love v. State*, 199 S.W.3d 447, 452 (Tex.App.-Houston [1st Dist.] 2006, pet. ref'd). In determining whether the accused participated as a party, the court may look to events occurring before, during, and after the commission of the offense. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex.Crim.App. 1994). "Evidence that a defendant knew his co-conspirators might use guns in the course of the robbery can be sufficient to demonstrate that the defendant should have anticipated the possibility of murder occurring during the course of the robbery." *Love*, 199 S.W.3d at 453.

■ Since an agreement between parties to act together in common design can seldom be proven by words, the State often must rely on the actions of the parties, shown by direct or circumstantial evidence, to establish an understanding or a common design to commit the offense. *Miller v. State*, 83 S.W.3d 308, 314 (Tex. App.-Austin 2002, pet ref'd); *see Wygal v. State*, 555 S.W.2d 465, 469 (Tex.Crim.App. 1977) (circumstantial evidence sufficient to show guilt as party). The agreement, if any, must be made before or contemporaneous with the criminal event, but in determining whether one has participated in an offense, the court may examine the events occurring before, during, and after the commission of the offense. *Beier v. State*, 687 S.W.2d 2, 3–4 (Tex.Crim.App. 1985); *Miller*, 83 S.W.3d at 314. Presence

at the scene may be considered in determining whether a defendant was a party to the offense, but mere presence at the scene without more is insufficient to prove guilt as a party. *Valdez v. State*, 623 S.W.2d 317, 321 (Tex.Crim.App.1979) (op. on reh'g); *Miller*, 83 S.W.3d at 314.

### C. Analysis

■ Appellant's guilt is established by her own words documented in her second and third statements. No evidence contrary to her statements was admitted at the trial. In her statements, appellant admits that she drove Dexter and Keithron to the carwash where a man was washing a barbeque pit in a large truck, and she dropped them off there. She admits she knew Dexter and Keithron both had guns. She saw them put on their bandana masks and hoodies as they got out of her car. She states that she "knew they were going to rob someone in the carwash." While the two men were robbing the man at the carwash with a firearm, appellant acknowledges that she stayed nearby. After she heard a loud gunshot coming from the direction of the carwash, she returned to the location to pick up Dexter and Keithron, who were standing on the street wearing black hoodies and holding their black bandana masks. Appellant stopped her car, they got in the car, and she drove them from the carwash to Keithron's house.

■ From this evidence, the jury could have reasonably determined that appellant entered into an agreement with Dexter and Keithron to commit the aggravated robbery of the man at the carwash, Davis, because she drove them to the location, left them there with their guns and wearing bandana masks and hoodies, knowing they were going to rob the man. The jury could also have reasonably determined that Dexter murdered Davis in furtherance of the conspiracy to rob him be-

cause he shot him during the course of taking Davis's cell phone that Davis's wife said was missing from Davis. Furthermore, from appellant's statements, the jury could have reasonably determined that she should have reasonably anticipated the murder of Davis by Dexter as a result of the carrying out of the conspiracy because she knew he had a loaded firearm when he went wearing a mask and hoodie to rob Davis. She also knew that immediately before Davis was killed, Dexter had driven Keithron to an area nearby where Keithron had robbed a lady at a bus stop with a firearm.

Viewing the evidence in the light most favorable to the verdict, a rational jury could have found that appellant, acting as a conspirator under the law of parties, was guilty of all essential elements of capital murder beyond a reasonable doubt. *See Love,* 199 S.W.3d at 453. Examining the evidence neutrally, we conclude the evidence supporting the conviction is not too weak to support the jury's verdict. *See Laster,* 275 S.W.3d at 518. Because no contrary evidence was introduced at appellant's trial, we also conclude the jury's verdict is not "against the great weight and preponderance of the evidence." *See Roberson v. State,* 16 S.W.3d 156, 171 (Tex. App.-Austin 2000, pet. ref'd). We hold the evidence is legally and factually sufficient to sustain the conviction as a conspirator under the law of parties.

We overrule appellant's fifth and seventh issues. We need not address, therefore, appellant's fourth and sixth issues that assert the evidence is legally and factually insufficient to convict her as a party by aiding the capital murder.

## Motion to Suppress

Appellant challenges the trial court's denial of her motion to suppress the two written statements and third statement, the tape recorded oral statement. Appellant contends that the three statements must be suppressed because she should have been given her statutory warnings when she made the two written statements while she was in custody, and the third statement repeated the contents of the first two statements, making the warning preceding the third statement ineffective.

### A. Standard of Review

 "A trial court's ruling on a motion to suppress, like any ruling on the admission of evidence, is subject to review on appeal for abuse of discretion." *Amador v. State,* 275 S.W.3d 872, 878 (Tex. Crim.App.2009); *see Swain v. State,* 181 S.W.3d 359, 365 (Tex.Crim.App.2005). "In reviewing a trial court's ruling on a motion to suppress, appellate courts must view all of the evidence in the light most favorable to the trial court's ruling." *State v. Garcia–Cantu,* 253 S.W.3d 236, 241 (Tex.Crim. App.2008).

 We conduct our review of the trial court's ruling through a bifurcated standard of review. *St. George v. State,* 237 S.W.3d 720, 725 (Tex.Crim.App.2007). We do not engage in our own factual review, rather the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony. *Id.* Trial courts are given almost complete deference in determining historical facts. *Id.* We are to "afford the same amount of deference to trial courts' rulings on 'application of law to fact questions,' also known as 'mixed questions of law and fact,' if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *State v. Ross,* 32 S.W.3d 853, 856 (Tex.Crim.App. 2000) (citing *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997)). We review de novo "mixed questions of law and fact" not falling within that category. *Id.*

More specifically, a trial court's ultimate "custody" determination "presents a 'mixed question of law and fact.'" *Herrera v. State*, 241 S.W.3d 520, 526 (Tex.Crim.App.2007). Therefore, we afford almost total deference to a trial court's "custody" determination when the questions of historical fact turn on credibility and demeanor. *Id.* at 527. Conversely, when the questions of historical fact do not turn on credibility and demeanor, we will review a trial judge's "custody" determination de novo. *Id.* Here, in assessing whether the trial court properly admitted the statements, we must defer to the trial court's findings that Sergeant Motard and Officer Arnold were credible witnesses, and that appellant and Hawkins were not credible witnesses. *See St. George*, 237 S.W.3d at 725.

Appellant suggests we should disregard the trial court's findings concerning the credibility of the witnesses. The record, however, contains conflicting evidence from the various witnesses about many disputed facts. Reconciliation of the evidence based on who is credible is a matter uniquely reserved for the trial court. *See id.* Furthermore, the impeachment of the officers that is suggested in this case largely comes from resorting to evidence presented in other trials—evidence not presented to the trial court in this case. But our task is to review the evidence actually before the trial court in this case

rather than resorting to external facts not before the court when it made its decision.[1] As noted above, we give almost complete deference to the trial court's custody determinations when those determinations turn on the credibility of the evidence before the trial court. *See Herrera*, 241 S.W.3d at 526.

The trial court made a pre-trial determination that appellant's statements were admissible. At trial, the State asked Officer Arnold questions concerning the issue of whether appellant was in custody. Appellant cross-examined Officer Arnold on the issue as well. Both the State and appellant also questioned Sergeant Motard extensively on this issue. Although, generally, our review of a pre-trial motion to suppress is limited to the evidence presented at the pre-trial hearing, where, as here, the parties re-litigate the issue during the trial on the merits, we review all the evidence presented. *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex.Crim.App. 2007); *Rachal v. State*, 917 S.W.2d 799, 809 (Tex.Crim.App.1996). During the trial, appellant's attorney re-urged the objections to the introduction of appellant's statements and the trial court overruled the objections. To the extent that the officers testified differently at the trial than at the motion to suppress hearing, the trial court considered that when it overruled appellant's objections and when it made its findings. *See Gutierrez*, 221

---

1. It is suggested that an opinion in an appeal, which concerns someone other than appellant, characterizes appellant as having been arrested when she went to the police station. But that appellate opinion is not part of the record in this case, and does not purport to make a legal analysis or determination that appellant was under arrest. Furthermore, in the record before us appellant did not introduce any evidence that would impeach any of the officers with testimony they may have given in another proceeding. No evidence introduced in this case shows the officers

testified inconsistently in another proceeding. If that type of evidence exists, then that may be a basis for a post-conviction habeas corpus challenge that would assert trial counsel was ineffective for failing to present impeaching evidence to the trial court. But absent any evidence that shows inconsistent testimony by the officers in other proceedings, and absent any prior appellate determination that analyzes whether appellant was arrested, the record in this case fails to show the trial court clearly erred by finding the officers credible.

S.W.3d at 687; *Rachal,* 917 S.W.2d at 809. Because the trial court ruled on the admissibility of appellant's statements during trial, it considered the entire testimony of the officers in making its credibility determination, and we must defer to that finding. *See Herrera,* 241 S.W.3d at 527; *St. George,* 237 S.W.3d at 725.

◼ We also note that the standard of review for the law applicable to this case is the law pertaining to statements taken from adults, not juveniles, as appellant suggests on appeal. Appellant contends that because she had recently turned 17 years of age, the warnings for juveniles should have been used in her case. *See Jeffley v. State,* 38 S.W.3d 847, 854 (Tex. App.-Houston [14th Dist.] 2001, pet. ref'd). The juvenile procedures are inapplicable, however, because, at 17 years of age, appellant was an adult at the time of the offenses. *See id.*

### B. Analysis of First Two Statements

In her first and second issues, appellant contends the trial court erred by admitting the first two statements. We address the first two statements together because they were taken on the same day within a short period of time under the same circumstances without *Miranda* warnings.

#### 1. Applicable Law for Admission of Noncustodial Statements

◼ In *Miranda,* the United States Supreme Court determined that an accused, held in custody, must be given the required warnings "prior to questioning." *Jones v. State,* 119 S.W.3d 766, 772 (Tex. Crim.App.2003). The failure to comply with the *Miranda* requirements results in forfeiture of the use of any statement obtained during that interrogation by the prosecution during its case-in-chief. *Id.* Similarly, the Code of Criminal Procedure provides that a statement is admissible against a defendant in a criminal proceeding if, among other things, the defendant was given the warnings set out in section 2(a) of article 38.22 before the statement was made and the defendant "knowingly, intelligently, and voluntarily" waived the rights set out in the warnings. *Herrera,* 241 S.W.3d at 526; *see also* TEX.CODE CRIM. PROC. ANN. art. 38.22, §§ 2(a), 3(a)' (Vernon 2005).

◼ For a statement taken from a person in custody to be admissible, the person must be informed of the following rights under the Code of Criminal Procedure:

(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2) any statement he makes may be used as evidence against him in court;

(3) he has the right to have a lawyer present to advise him prior to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview at any time.

TEX.CODE CRIM. PROC. ANN. art. 38.22, § 2(a); *see Woods v. State,* 152 S.W.3d 105, 116 (Tex.Crim.App.2004). The warnings provided in the Code are virtually identical to the *Miranda* warnings, with one exception—the warning that an accused "has the right to terminate the interview at any time" as set out in section 2(a)(5) is not required by *Miranda. Herrera,* 241 S.W.3d at 526. As with the *Miranda* warnings, the warnings in article 38.22 of the Code are required only when there is custodial interrogation. *Id.; Woods,* 152 S.W.3d at 116; TEX.CODE CRIM. PROC. ANN. art. 38.22, § 3(a). Our construction of "custody" for purposes of arti-

cle 38.22 is consistent with the meaning of "custody" for purposes of *Miranda. Herrera,* 241 S.W.3d at 526.

■ Four general situations may constitute custody for purposes of *Miranda* and article 38.22: (1) the suspect is physically deprived of his freedom of action in any significant way; (2) a law enforcement officer tells the suspect he is not free to leave; (3) law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) there is probable cause to arrest the suspect, and law enforcement officers do not tell the suspect he is free to leave. *Gardner v. State,* 306 S.W.3d 274, 294 (Tex.Crim.App.2009); *see also Dowthitt v. State,* 931 S.W.2d 244, 254 (Tex. Crim.App.1996). The fourth category applies only when the officer's knowledge of probable cause is communicated to the suspect or by the suspect to the officer; even then custody is established only "if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Gardner,* 306 S.W.3d at 295 n. 48.

■ "[T]he question turns on whether, under the facts and circumstances of the case, 'a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave.'" *Nguyen v. State,* 292 S.W.3d 671, 678 (Tex.Crim.App.2009). The reasonable person standard presupposes an innocent person. *Dowthitt,* 931 S.W.2d at 254. The subjective intent of law enforcement officials to arrest is irrelevant, unless that intent is somehow communicated or otherwise manifested to the suspect. *Id.* "The determination of custody must be made on an ad hoc basis, after considering all of the (objective) circumstances." *Id.* at 255;

*Martinez v. State,* 171 S.W.3d 422, 430 (Tex.App.-Houston [14th Dist.] 2005, no pet.) (citing *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994)).

■ Factors for determining if a person is in custody include "whether the suspect arrived at the place of interrogation voluntarily, the length of the interrogation, whether the suspect's requests to see relatives and friends are refused, and the degree of control exercised over the suspect." *Xu v. State,* 100 S.W.3d 408, 413 (Tex.App.-San Antonio 2002, pet. ref'd). After examining each of those factors, we also address whether there was probable cause to arrest appellant and whether any of the four situations constituting custody were established. *Gardner,* 306 S.W.3d at 294.

### 2. Voluntariness of Arrival at Police Station

Appellant contends she was in custody when she arrived at the police station because (a) her car and keys were taken without her voluntary consent to search, (b) her cell phone was taken from her, (c) she rode in a police car to the police station, and (d) she was told she was not free to leave. Neither the trial court's findings nor the record supports these assertions.

#### a. The Car and Keys

■ The trial court's findings of fact expressly determine that appellant consensually agreed to have the officers take her car for a search. The court finds:

> 5. While at the defendant's job, they asked for consent to search her car after they learned it was a black Nissan Sentra which had been described as possibly linked to the offense they were investigating.

6. The defendant freely and voluntarily agreed to the search of her vehicle. . . .

The record supports these findings. In the consent form signed by her, appellant made the following acknowledgements:

In giving this consent, I authorize the officers to seize any and all letters, papers, materials, and other property that they desire.

I understand that I have the right to refuse to give this consent to search and can refuse to sign this form.

I further state that no promises, threats, force, physical nor mental coercion of any kind have been used against me in order for me to agree to sign this document and to consent to the search(es) that I have authorized above.

Appellant correctly notes that her car keys and possibly her house keys went with her towed car. Officer Arnold's trial testimony explained that the car keys likely went with the car and tow truck driver, and that the house keys may have been with the car keys. Although he testified inconsistently at the pretrial motion to suppress hearing by claiming that no one took appellant's car or house keys, Officer Arnold's trial testimony stated, "[W]e keep the keys so the tower, the wrecker driver[,] can do what he needs to do if he needs to turn the wheel." The fact that the officers towed her car and took her keys cannot be a basis for concluding appellant believed she was in custody because the record shows appellant consented to those actions. *See Dancy v. State,* 728 S.W.2d 772, 777–79 (Tex.Crim.App. 1987) (finding no custody when suspect voluntarily came with police to station, voluntarily answered questions, consented to give hair samples, consented to allow police to take his shoes to run print comparisons, and was arrested at conclusion of interview).

### b. Cell Phone

Appellant claims officers took her cell phone so she could not call anyone, and Hawkins states that she tried to reach appellant by cell phone but could not that day. However, the trial court found the testimony by appellant and Hawkins as lacking in credibility. In contrast, the trial court found credible the testimony by the officers who said they did not take the cell phone so it must have been with appellant. Sergeant Motard said appellant was free to call her mother if she wished and she did not ask to use the telephone. He acknowledged, however, that he did not offer her the use of a telephone. Because the evidence found credible by the trial court showed that her cell phone was not taken from her by the officers, appellant could not reasonably believe she was in custody for that reason.

### c. Ride in Patrol Car

Although appellant states she "felt like [she] had to go with them because they told [her] to," the trial court found her testimony not to be credible. The findings of fact by the trial court determined appellant voluntarily rode in the back seat of a patrol car from her work to the police station. The findings of fact by the trial court state,

7. The defendant voluntarily agreed to go to the police station to be interviewed.

8. She was driven in a patrol car to the station, but she was not held against her will, handcuffed, or forced to accompany the officer.

9. She could have declined to go with police or she could have requested to be returned to her job or home at any time. Police would have complied with her request, but she did not make one.

The record supports the trial court's findings. Evidence shows that Officer Arnold asked appellant if she "minded" going to the police station to give a statement. Officer Arnold explained that the reason she rode in the patrol car rather than an unsecured car was because all the homicide officers with unsecured cars were unavailable. Appellant was not handcuffed. Officer Arnold said that although she was in a marked patrol car with no door handles on the inside, if appellant had wanted to get out she could simply have asked the patrol officer to let her out of the car. Furthermore, having voluntarily consented to having her car towed, appellant understood that the reason she was riding in the patrol car was merely for a ride to the station to give a statement, and not because she was in custody. The ride in the police car would not reasonably cause appellant to believe she was in custody because she consented to have officers take her car to be searched, she was not in handcuffs, she was asked if she minded going to the police station to give a statement, she voluntarily agreed to go with the officers to the police station, the marked police car was the only car available to drive appellant to the police station to give a statement, and the officers would have honored any request by her to not accompany them.

### d. Free to Leave

■ Although appellant claims she was not told she was free to leave, the trial court expressly made findings contrary to that assertion when it stated,

11. Before taking any statements, Sergeant Motard informed the defendant that she was not under arrest and that she could leave at any time.

. . . .

16. Sergeant Motard did not threaten, coerce, or promise the defendant anything in exchange for her statement.

. . . .

18. The defendant agreed in her first written statement that Sergeant Motard had told her she was not under arrest. . . .

The trial court found credible the testimony by Sergeant Motard, who testified that appellant was not handcuffed, was not in custody, and was told by him that "she was not under arrest and she was free to go anytime she wanted to." Sergeant Motard explained that he did not view her as a suspect, but instead as the girlfriend of one of the suspects and that her car may have been involved in the offense. Furthermore, the first statement itself states, "I have been told I am not under arrest." The record, therefore, supports the trial court's findings that appellant knew she was not under arrest because she was expressly advised of that fact. *See Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (holding person not in custody when he came voluntarily to police station, was immediately informed that he was not under arrest, participated in interview, and left police station without hindrance).

■ Although her keys went with her car to the police station to be searched, we conclude, based on the trial court's findings and the record, that appellant was not in custody when she arrived at the police station. Appellant voluntarily consented to accompany the officers to the police station, and to have the officers search her car and take her keys. The officers did not take her cell phone or prevent her from making telephone calls. Furthermore, when she arrived at the police station, she was specifically told she was not under arrest and could leave at any time.

### 3. Length of Interrogation

■ Appellant was at the police station for four hours when she made the two written statements. The findings of fact state, "The defendant remained at the station from approximately 6:00 p.m. until approximately 10:00 p.m." From 4:30 p.m. to 6:00 p.m. before she got to the police station, appellant was in the mall parking lot with Officer Arnold, and then she rode with another police officer to the police station.

For approximately the first hour from 6:00 p.m. to 7:05 p.m., appellant gave a statement about the Aparece and Ngo capital murder that she witnessed when she was a passenger in her black car. Between 7:05 p.m. and 8:30 p.m., Sergeant Motard discussed with other officers what appellant had revealed to him and he was asked to find out if she knew anything about the Davis case. Briefly, just before 8:30 p.m., Sergeant Motard asked appellant if she knew anything about the Davis case and she said she did. He "asked her if she would make another statement as to that, and she agreed." The second statement began at 8:30 p.m. and ended at 9:15 p.m.

Here, the four hour period of time at the police station does not constitute a length of time that would cause a reasonable person to believe that she was in custody because that length of time was necessary due to the amount of information being received from appellant about the multiple crimes committed by the group of people with whom she associated. Appellant revealed extensive information about how she witnessed four people commit a capital murder of two people, an auto theft report to the police when Keithron had her car, the robbery of a lady at a bus stop, and the capital murder of Davis. The amount of information, combined with the other circumstances that show appellant was at

the police station voluntarily, demonstrate that she did not reasonably believe she was in custody when she was with police officers at the police station for four hours. *See Meek v. State,* 790 S.W.2d 618, 622 (Tex.Crim.App.1990) (finding no custody when suspect came to station voluntarily at time of his own choosing, was allowed to step outside building and go unaccompanied to his car during interviews, and "a few hours" later was allowed to leave unhindered after statements were completed); *State v. Rodriguez,* 986 S.W.2d 326, 330 (Tex.App.-El Paso 1999, pet. ref'd) (determining appellant not in custody although interrogation lasted several hours); *Bradley v. State,* 960 S.W.2d 791, 794–95 (Tex.App.-El Paso 1997, pet. ref'd) (determining interrogation lasting approximately six hours was noncustodial).

### 4. Access to Relatives and Friends

■ Appellant had access to her relatives and friends. She spoke to Dexter privately after she made the second statement. The trial court made findings of fact, as follows:

25. After giving both statements, Sergeant Motard learned that Dexter wanted to speak with the defendant.

26. Sergeant Motard asked the defendant if she wanted to speak with Dexter, and she stated that she did.

27. Sergeant Motard and [Officer] Abbondondalo permitted the defendant and Dexter to converse privately for approximately five minutes.

The record shows that after she completed the second statement, appellant spoke to Dexter because, according to Sergeant Motard, "she was not under arrest," and she wanted to speak to him when she was told that he wanted to speak to her. Appellant walked alone from Sergeant Motard's cubicle to Officer Abbondondalo's cubicle where Dexter was, and the two

spoke privately for several minutes before she came back to Sergeant Motard's cubicle. When she returned to the cubicle, she appeared teary eyed and emotional. Sergeant Motard believed she was upset about "everybody's circumstance that are her friends." This private visit with Dexter away from the officers shows appellant did not reasonably believe she was in custody. *See Meek*, 790 S.W.2d at 622 (finding no custody in part because Meek was allowed to step outside building and go unaccompanied to his car during interviews).

Hawkins said the officers told her she could not go with them when they went to talk to appellant at the McDonalds, but the trial court found her testimony as lacking in credibility. The record, therefore, does not support the claim that Hawkins was denied access to appellant before appellant went to the police station and while she was there.

Furthermore, appellant went home after she made the statements. The trial court found that "Sergeant Motard and [Officer] Abbondondalo then drove the defendant home and left her there." Sergeant Motard drove appellant home at around 10:30 p.m. or 11:00 p.m. and told her mother that appellant was hanging out with some bad guys and needed to stop doing that. Evidence that appellant went home after making the two statements shows that she did not reasonably believe that she was in custody. *See California v. Beheler*, 463 U.S. 1121, 1124–25, 103 S.Ct. 3517, 3519–20, 77 L.Ed.2d 1275 (1983) (holding person not in custody based on facts that he voluntarily accompanied police to station, talked to officers, and was permitted to return home). We conclude that appellant's access to her friend, Dexter, when she was at the police station, and to her family when she went home after making the second statement, are facts that show

she did not reasonably believe she was in custody during the time she was at the police station making the first two statements.

### 5. Degree of Control Exercised

■ Appellant testified that she did not feel like she could leave, was scared, and felt she had to do whatever the officers asked so that she would be allowed to go home. She also claims she did not feel comfortable requesting to go to the restroom even though she needed to go. The trial court, however, found her testimony as lacking credibility and made findings contrary to these assertions.

The trial court's finding states, "Police did not restrict the defendant's freedom of movement while she was at the police station." The record shows officers did not handcuff appellant nor restrict her freedom of movement in any way while she was at the police station. She walked alone to speak privately with Dexter. Furthermore, the court found, and the record shows, that "Sergeant Motard spoke to the defendant in a conference room, and then he took her to his cubicle where he typed out a written statement while she described the events."

The trial court determined that appellant was offered basic necessities, as shown by a finding of fact that states, "Sergeant Motard offered the defendant food and drink, but she declined." The trial court also found that "the defendant did not request to use the restroom; but had she requested it, he would have directed her to a nearby restroom." The record shows that Sergeant Motard explained that an officer would have shown appellant where the restroom was because she would not know how to get there, but appellant never requested to go to the restroom. He also offered her the opportunity to go

to the restroom before she began the first statement.

The trial court made findings specifically determining that appellant voluntarily signed the second written statement, as follows:

22. The defendant signed the statement after Sergeant Motard told her to sign it "if it's correct."

23. Sergeant Motard did not threaten, coerce, or promise the defendant anything in exchange for the second written statement.

24. The defendant chose of her own free will to sign the second statement.

The record supports these findings and shows that Sergeant Motard did not promise appellant anything for her giving the statement.

Because the evidence shows the officers did not exercise the degree of control associated with an arrest, the evidence fails to show appellant reasonably believed she was in custody. *Compare with Jones,* 119 S.W.3d at 776 (finding person in custody based on facts that he was incarcerated in jail, taken to small room to meet with two officers, and confronted with information that someone had identified him as murderer).

## 6. Probable Cause

■ Appellant asserts that the police believed her to be a suspect when they went to her house looking for Keithron. Hawkins contends the officers knew appellant worked at McDonalds before Hawkins told them that. But Officer Arnold testified that appellant was not a suspect and that they learned where to find her from what Hawkins told him. The trial court found Officer Arnold more credible than Hawkins and appellant. Furthermore, even if appellant was the focus of the investigation, it would not render her as

being in custody for purposes of *Miranda* or article 38.22. *See Gardner,* 306 S.W.3d at 294.

Appellant suggests officers had probable cause to arrest her when she made the first statement acknowledging she witnessed the Aparece and Ngo capital murder. In that statement, however, appellant said she was merely present as a witness at the events. *See Valdez,* 623 S.W.2d at 321 (mere presence insufficient to convict). There was no probable cause to arrest her for the Aparece and Ngo offense.

Appellant claims that after she signed the first statement, Sergeant Motard left her and then returned and told her that someone had informed him that she was the driver in the Davis murder. Appellant also contends Sergeant Motard was going back and forth to discuss her version with the other officers while he was taking her statement. The record, however, does not support these assertions. The trial court found appellant's testimony concerning these events not credible. Furthermore, Sergeant Motard explained that he discussed appellant's version of the Aparece and Ngo case with other officers to attempt to reconcile her statement with the statements of the other people who had given statements about that case, but he did so during the break between the first and second statements. He did not testify that he was going back and forth to talk to the officers about what appellant told him as she was making the statement. Appellant was not considered a suspect until she acknowledged she was the driver in the Davis case.

The trial court made a finding of fact stating, "Sergeant Motard did not suspect the defendant in the Brady Davis case, and he did not know her level of participation when he spoke to her about it. She was not the focus of the investigation because

he believed she was, at most, a witness." The record shows that when Sergeant Motard asked appellant about the Davis case that it was a fishing expedition. When appellant admitted during the making of the second written statement that she was the driver in the Davis case, the officers first had probable cause to arrest her.

### 7. Four "Custody" Situations Did Not Occur

Deferring to the trial court's findings of fact based on the credibility of the witnesses, the first three situations where custody is established are not shown here. More specifically, (1) appellant was not physically deprived of her freedom of action in any significant way, (2) an officer told her she was free to leave, and (3) the officers did not create a situation that would lead a reasonable person to believe that her freedom of movement had been significantly restricted. *See Gardner,* 306 S.W.3d at 294; *Dowthitt,* 931 S.W.2d at 254.

Concerning the fourth situation where "custody" occurs, the record shows there was probable cause to arrest appellant when she admitted being the driver in the Davis case, but the officer never did anything to manifest to her that he believed there was probable cause to arrest her. *See Gardner,* 306 S.W.3d at 295 n. 48. The record does not show that appellant reasonably knew that by admitting to being the driver in the Davis case that the officer had probable cause to arrest her. *See id.* Furthermore, the other circumstances detailed above would not lead a reasonable person to believe that she was under restraint to the degree associated with an arrest. *See id.*

Not only did she voluntarily make the written statements, appellant went voluntarily to the police station, was told she could leave, remained unhandcuffed

throughout the statements, was at the station four hours to discuss two separate capital murders, went unescorted to speak privately with Dexter, and went home after she made the statements. Under these circumstances, a reasonable person would not believe that she was under restraint to the degree associated with an arrest. *See id.; Garcia v. State,* 106 S.W.3d 854, 858–59 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd) (holding reasonable person in Garcia's situation would not have believed he was in custody because, although there was probable cause to arrest Garcia, he voluntarily went to police station, was told that he could leave, voluntarily gave statement, statement took 30 minutes, only two unarmed officers were with him, he was taken to visitor's room where he was left, unguarded, with his girlfriend, and nothing prevented him from simply leaving police station); *Trejos v. State,* 243 S.W.3d 30, 47 (Tex.App.-Houston [1st Dist.] 2007, pet. ref'd) (finding no custody when suspect "rode with a police officer to the station" and "was only interviewed by one police officer, who was in plain clothes, and in an office-like setting"); *compare with Dowthitt,* 931 S.W.2d at 254 ("custody" began when Dowthitt admitted to his presence during murders because "a reasonable person would have realized the incriminating nature of the admission," and other factors were present that "involv[ed] the exercise of police control" over him, such as lengthy interrogation lasting over 12 hours, police officers accompanying him to restroom, and police officers ignoring his requests to see his wife).

### 8. Conclusion

We conclude the record shows that appellant did not reasonably believe she was in custody because she voluntarily went to the police station, the length of the interrogation was not so long that she would have

believed she was in custody, she had access to her friends and family, the officers did not exercise the degree of control over her that would be associated with an arrest, the officers did not have probable cause to arrest her until the point in her second statement when she admitted driving Dexter and Keithron to and from the aggravated robbery of Davis, and the officers did not manifest to her that they had probable cause to arrest her nor did the circumstances show she was in custody. The trial court made findings of fact and conclusions of law supporting the conclusion that appellant was not in custody, and those findings and conclusions are supported by the record. We must afford almost total deference to the trial court's determination that appellant was not in custody when she made the two written statements. *See Herrera,* 241 S.W.3d at 526–27. We must do so because under these circumstances the question of whether appellant was in custody is a mixed question of law and fact that turns on the credibility determinations made by the trial court, which found appellant and her mother not credible and the officers who testified credible. *See id.* Because appellant was not in custody when the first two statements were made, *Miranda* warnings were not required. *Id.* We hold the trial court did not abuse its discretion by denying the motion to suppress the two written statements by appellant and admitting redacted portions into evidence at her trial.

We overrule appellant's first and second issues.

### C. Analysis of Third Statement

In her third issue, appellant contends the third statement must be suppressed because, although she received *Miranda* warnings before the statement was made, the statement was merely a rehash of the two earlier written statements that were unlawfully obtained because they were made without the *Miranda* warnings. We address (1) the law concerning midstream warnings, (2) appellant's challenge premised on the invalidity of the first two statements, (3) the evidence that the two step questioning tactic was not employed, and (4) the evidence concerning whether curative measures were taken in this case.

### 1. Law Concerning Midstream Warnings

Midstream *Miranda* warnings are not permissible. *See Missouri v. Seibert,* 542 U.S. 600, 601, 124 S.Ct. 2601, 2604, 159 L.Ed.2d 643 (2004) (plurality holding that whenever two-stage interview occurs and *Miranda* warnings are delivered "midstream," admissibility of post-warning statement depends on whether warnings could have been effective to accomplish objective); *Martinez v. State,* 272 S.W.3d 615, 621–27 (Tex.Crim.App.2008) (holding that two-step interrogation technique was used in calculated way to undermine *Miranda* warning, as shown by totality of circumstances that Martinez was in custody; officer did not give him *Miranda* warnings before questioning him; Martinez made statements to polygraph examiner; after *Miranda* warnings, Martinez was confronted with facts learned from polygraph examiner; and entire statement to officers occurred within short period of time at same police station where polygraph occurred).

Courts should examine whether the officer deliberately used a two-step, "question first, warn later" strategy. *Carter v. State,* 309 S.W.3d 31, 36 (Tex.Crim. App.2010). If the court finds a deliberate effort, then post-warning statements must be excluded unless "curative measures" are taken before the post-warning statement is made. *Id.* "[C]urative measures should be designed to ensure that a reasonable person in the suspect's situation

would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Martinez,* 272 S.W.3d at 621. An appropriate curative measure, for example, is a substantial break in time and circumstances between the unwarned statement and the *Miranda* warning. *Id.* Curative measures allow the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. *Id.*

■■■ Courts should determine "whether the evidence shows that [the interrogating officer] deliberately employed a two-step 'question-first, warn later' interrogation technique to circumvent [the] appellant's *Miranda* protections." *Carter,* 309 S.W.3d at 38. Because the "question of whether the interrogating officer deliberately withheld *Miranda* warnings will invariably turn on the credibility of the officer's testimony in light of the totality of the circumstances surrounding the interrogation," a factual finding regarding the officer's credibility is entitled to deference on appeal and is reviewed only for clear error. *Id.* at 39.

■■■ Where the two-step questioning tactic is not deliberately employed, "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Oregon v. Elstad,* 470 U.S. 298, 318, 105 S.Ct. 1285, 1298, 84 L.Ed.2d 222 (1985); *Carter,* 309 S.W.3d at 36. In this situation, where the first statement is unwarned but not coerced, "the admissibility of any subsequent statement should turn ... solely on whether it is knowingly and voluntarily made." *Elstad,* 470 U.S. at 309, 105 S.Ct. at 1293; *Carter,* 309 S.W.3d at 32. "Unless a deliberate two-step strategy is employed, *Elstad* applies." *See Carter,* 309 S.W.3d at 37.

### 2. Appellant's Challenge

Appellant's entire reason for asking that the third statement be suppressed is her theory that the first two statements were taken unlawfully because *Miranda* warnings were not given when she made the statements while in custody. We have already determined, however, that because appellant was not in custody when the first two statements were given, *Miranda* warnings were not required. Because appellant's challenge to the third statement is premised solely on the failure to give *Miranda* warnings before the first two statements were taken, a ground we have determined lacks validity because appellant was not in custody, we hold the trial court properly admitted the third statement by appellant. *See Martinez,* 272 S.W.3d at 621–27.

### 3. Evidence that Two–Step Questioning Tactic Not Employed

■■■ But even if we assume the trial court erred by determining appellant was not in custody when she made the first two statements, the trial court made findings supporting the determination that the officers did not employ a two-step questioning tactic to violate the principles of *Miranda.* The trial court found the officers' testimony credible when they explained that they did not read the warning to appellant because they determined she was a witness to the events and not in custody. *See Seibert,* 542 U.S. at 614, 124 S.Ct. at 2611 (observing that *Elstad* court took care to mention that officer's initial failure to warn was "oversight" that may have been result of confusion as to whether brief exchange qualified as "custodial interrogation"). Because the trial court found credible the officers' testimony that appellant was not in custody when she made the first two

statements, even if the officers erred in their belief that she was not in custody, that error does not amount to a deliberate tactic to circumvent *Miranda*. The trial court found credible Sergeant Motard's explanation that questioning appellant about the Davis case was a "fishing expedition," and . it determined the circumstances showed appellant was not in custody when she admitted her role in the Davis case. At most, if the officers were wrong about whether appellant was in custody, that error shows a mistake, but, in light of the trial court's factual findings based on the credibility of the witnesses, it does not show a deliberate tactic to employ a two-step interrogation technique. Additionally, the evidence fails to show that the third statement taken after *Miranda* warnings were given to appellant was calculated to undermine the *Miranda* warning because the third statement was taken after appellant went home for the evening to spend the night with her family and was taken only after she returned to the police station around noon the next day. *Cf. Martinez*, 272 S.W.3d at 621–27 (concluding two-step interrogation technique was used in· calculated way to undermine *Miranda* warning, based in part on evidence that all statements to officers occurred within short period of time at same place at police station).

We hold the record fails to show the officers deliberately used a two-step, "question first, warn later" strategy. *See Carter*, 309 S.W.3d at 36. The record, therefore, fails to show the trial court committed clear error in admitting the third statement. *See id.* In the absence of a deliberate two-step questioning tactic, the principles in *Elstad* apply. *Carter*, 309 S.W.3d at 37 ("Unless a deliberate two-step strategy is employed, *Elstad* applies.").

Under *Elstad*, the third statement is admissible if appellant waived her rights after having been given the requisite *Miranda* warnings and if she made the statement knowingly and voluntarily. *See Elstad*, 470 U.S. at 309, 105 S.Ct. at 1293; *Carter*, 309 S.W.3d at 32. Because the tape recording shows that Sergeant Motard read appellant her *Miranda* rights at the start of the third statement and that she subsequently made voluntary and knowing statements demonstrating her culpability in the crime, we hold that even if the first two statements were inadmissible for failure to give *Miranda* warnings to a person in custody, the third statement would be admissible under Federal and Texas case precedent. *See Elstad*, 470 U.S. at 309, 105 S.Ct. at 1293; *Carter*, 309 S.W.3d at 32. We also hold that the admission of the third statement would render the erroneous admission of the first and second statements harmless beyond a reasonable doubt because the first statement did not mention the Davis case and the second statement's contents were fully contained within the third statement. *See Jones*, 119 S.W.3d at 777.

### 4. Evidence of Curative Measures

We have determined that the trial court properly admitted the three statements because appellant was not in custody when the first two statements were made and *Miranda* warnings were not required. Alternatively, we have determined that, assuming appellant was in custody when she made the first two statements so that *Miranda* warnings were required, the third statement, provided after *Miranda* warnings were given, is admissible because a deliberate two-step questioning technique was not employed and the third statement was voluntarily made. We need not address, therefore, a third alternative way of upholding the judgment, which would apply if the record shows that curative meas-

ures were taken between the unlawful statements and the lawful statement. *See Seibert*, 542 U.S. at 615, 124 S.Ct. at 2612 (stating that in *Elstad* "the Court thought any causal connection between the first and second responses to the police was 'speculative and attenuated' "). Here, the third statement was made after appellant waived her statutory rights after she had been home for approximately 14 hours from 10:00 p.m. on June 23 to noon on June 24. She was at home with her family before she returned to the police station voluntarily, unhandcuffed, and in an unmarked car to clarify her earlier statements.

Appellant focuses on Sergeant Motard's use of the word "rehash" when describing the contents of the third statement in comparison to the contents of the second statement. As used in this case, "rehash" means that the substance of the statements was the same—the events transpiring on the day Davis was killed and on the day Aparece and Ngo were killed. The third statement, however, consists of approximately a five minute narrative by appellant where she explains the events about the Davis case and it was in this narrative that she made the inculpating statements. Although the record includes factors that weigh towards a finding that curative measures were taken between the first two statements and the third statement, we need not decide whether the break in time and circumstances between the second and third statements show that the third statement was made independently of second statement so that the *Miranda* warnings were effective. *See Martinez*, 272 S.W.3d at 621 (observing that appropriate curative measure is substantial break in time and circumstances between unwarned statement and *Miranda* warning). The reason we need not

reach this decision is because this would be a third alternative way of upholding the judgment, which is unnecessary in light of our other holdings.

We hold the trial court properly admitted the third statement because the first two statements did not violate the requirements of *Miranda* or the Code of Criminal Procedure due to the evidence that appellant was not in custody when she made the first two statements, and, alternatively, because the trial court's findings and evidence do not show that the officers deliberately employed a two-step strategy to circumvent the requirements of *Miranda*.

We overrule appellant's third issue.

## Conclusion

We affirm the conviction.

Justice KEYES, dissenting.

EVELYN V. KEYES, Justice, dissenting.

I respectfully dissent. A jury found appellant, Ashley Ervin, guilty of capital murder and assessed punishment at life imprisonment without the possibility of parole.[1] Appellant argues on appeal that her two written statements and oral recorded statement were custodial statements taken pursuant to a deliberately employed "question first, warn later" interrogation technique to circumvent her *Miranda* protections. She contents that their admission into evidence against her at her trial violated of the United States and Texas Constitutions and article 38.22 of the Texas Code of Criminal Procedure and that the errors were harmful. I agree. Therefore, I would reverse and remand for a new trial.

---

1. *See* TEX. PENAL CODE ANN. § 19.03 (Vernon Supp. 2009).

## FACTS

### A. Background Facts

On May 26, 2006, when appellant was 17 years old, she, Keithron Fields, and Dexter Johnson robbed and killed Brady Davis. Fields and Johnson robbed and shot Davis, and appellant drove them to and from the scene in her car. Davis died at the scene of the crime from the gunshot wound.

On June 23, appellant gave police two written statements at police headquarters describing an extraneous double murder and describing the Davis murder without being issued *Miranda* warnings.[2] The next day she gave the police a recorded oral statement at police headquarters regarding the Davis murder that confirmed the information provided in her second written statement. Appellant was given a *Miranda* warning at the beginning of her recorded oral statement, and she waived her rights. A warrant for her arrest was issued immediately upon completion of her recorded statement, and she was arrested and indicted for capital murder. Appellant moved to suppress all three statements under the Fourth and Fifth Amendments to the United States Constitution and article 38.22 of the Texas Code of Criminal Procedure.

### B. Suppression Hearing

Sergeant P. Motard testified at the suppression hearing in this case that the police originally sought appellant on June 23, 2006 for questioning about locating Fields based on his involvement in an extraneous matter, the Aparece/Ngo missing persons' case. The police were part of the Gang Murder Unit of the Houston Police Department (HPD), which was investigating the disappearance of Maria Aparece and Huy Ngo on June 20, 2006 and gathering information to develop suspects.[3] They were aware that appellant and Fields dated and had information that her car might have been involved in that crime; they had been asked to locate both Fields and appellant's car and to confirm that appellant owned a black Nissan.

Officer D. Arnold and other officers went to appellant's home and asked for Fields. Appellant's mother stated that neither Fields nor appellant was in the home, but she told the officers that they could find appellant at her work. The officers went to appellant's work, told her they were doing an investigation, and asked if she would speak with them, which she did. At the officers' request, appellant walked them to her car, a black Nissan Sentra. At 5:40 p.m., she signed a consent form to allow the police to tow and search the vehicle. The officers towed the car for further investigation.

Appellant voluntarily agreed to answer more questions and was transported to police headquarters in the back of a locked and secured patrol car. Sergeant Motard testified at the suppression hearing that appellant was not handcuffed and that her cell phone and keys were not taken from her. He testified that the officers had no

**2.** See *Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966).

**3.** The Aparece/Ngo investigation resulted in the arrest, trial, and capital murder convictions of Johnson and Fields. *See Johnson v. State*, No. AP–75,749, 2010 WL 359018 (Tex. Crim.App. Jan. 27, 2010), *cert. denied,* —— U.S. ——, 130 S.Ct. 3515, 177 L.Ed.2d 1101 (2010) (not designated for publication) (affirming capital murder conviction of Dexter Darnell Johnson in deaths of Aparece and Ngo); *Fields v. State*, No. 01–07–00856–CR, 2009 WL 723992 (Tex.App.-Houston [1st Dist.] March 19, 2009, pet. ref'd) (not designated for publication) (affirming capital murder conviction of Keithron Marquis Fields in deaths of Aparece and Ngo).

warrant for her arrest and did not consider her in custody, that they were just trying to obtain Fields' location from her and "were hoping she was just simply a witness." He testified that appellant could have left at any time, but she would have had to have asked because the patrol car was "a secured vehicle."

### 1. First Written Statement

While at the police station, appellant was interviewed by Sergeant Motard, who asked her to lay out anything she knew about the Aparece/Ngo matter. Sergeant Motard testified that appellant was not read her *Miranda* rights because she was not considered to be a suspect or in custody. Appellant provided Sergeant Motard with a detailed account of the events that led to the killing of Aparece and Ngo, placing herself at the scene of the crime.

Sergeant Motard asked appellant to memorialize her account as a written statement, which she did at his workstation. Appellant's statement, signed at 7:05 p.m., indicated that she, Tim Randle, Alvie Butler, Dexter Johnson, and Keithron Fields were riding in her car before Aparece and Ngo were killed, that they followed the victims, and that Johnson killed both Aparece and Ngo. Sergeant Motard took the written statement without giving appellant a *Miranda* warning. Her statement included the sentence, "I have been told I am not under arrest." Appellant asked if she was allowed to go to the bathroom and was permitted to do so; she declined the offer of something to drink.

### 2. Second Written Statement

Sergeant Motard testified that, after he took appellant's first written statement, appellant remained unguarded at his workstation. He did not tell her she could go home. Instead, he told her, "Let me just check with these other guys and see how this whole thing is—you know, what your information is versus what they're remembering." Sergeant Motard testified that he left the workstation and met with Detective A. Brown and the team investigating the killing of Brady Davis, who were interviewing the male suspects who had been taken into custody. He told them her statement "sounded pretty good," and he then compared his notes with the information the other investigators were obtaining from their interviews.[4]

---

4. According to the *Johnson* opinion affirming Johnson's capital murder conviction in the deaths of Aparece and Ngo, Johnson was arrested for marijuana possession on June 21 by the Humble Police Department (Humble P.D.) following Fields' mother's report of unknown vehicles in the parking lot of her apartment complex—one of which turned out to be Aparece's. *Johnson*, 2010 WL 359018, at *1–2. Based on information obtained by the Humble P.D. and by the Fort Bend Sheriff's Department, which was investigating the Aparece/Ngo missing persons report, Johnson was charged with aggravated robbery on June 22 and transferred to the Harris County Jail. *Id.* at *2–3. Around 8:00 p.m., he was transported from the Harris County Jail to the HPD's homicide division, where Officer Abbondondalo read him his rights and then questioned him using a tape recorder. *Id.* Also on June 23, according to the *Johnson* opinion, Detective A. Brown of HPD's homicide division helped execute an arrest warrant for Timothy Randle. *Id.* at *3. Detective Brown transported Randle to the HPD homicide division and questioned him. *Id.* Twenty minutes into his questioning of Randle at HPD headquarters, Brown suspended the interrogation so that Randle could show him the location of Aparece's and Ngo's bodies. *Id.* HPD Officer Abbondondalo accompanied them to the crime scene. *Id.* After locating the bodies, they returned to the homicide division, where Brown resumed questioning Randle. *Id.* "Around that time, the Ervins[, appellant and her brother Louis,] were also arrested and questioned at the homicide division." *Id.*

According to the *Fields* opinion, HPD also obtained a warrant for Fields' arrest on June 23 based on the statements given by Johnson

Sergeant Motard testified that, upon learning of appellant's statement regarding the Aparece/Ngo case, Detective Brown began to suspect that appellant had information relevant to the Brady Davis case. He asked Sergeant Motard to question appellant concerning the Davis killing. Sergeant Motard testified that, until then, he had no suspicion that appellant was involved in the Davis case, and he characterized his subsequent questioning of her as a "fishing expedition."

According to the record, before he started taking appellant's second written statement at 8:30 p.m., Sergeant Motard testified that he "brought up Brady Davis because Brown had asked me to. So there was a little brief conversation about that whole incident. And [appellant] acknowledged that she was aware of circumstances surrounding his death." Motard then asked appellant to provide a statement concerning the Davis case, and appellant agreed. In her statement, appellant implicated herself as the driver in the crime. After appellant provided her statement about the Davis case orally, she consented to memorialize it as a second written statement.

According to appellant's second written statement, in the hours preceding Davis's death, appellant, Johnson, and Fields had been "out all night." In the early morning hours, while appellant was asleep in the back seat of her car, Johnson was driving around without any evident destination. Appellant stated that Johnson stopped the car and Fields got out and robbed a woman. When Fields returned to the car, he stated that the woman did not have any money. Following this robbery, appellant drove her car, and Johnson and Fields were passengers. As she approached the intersection of Homestead and Hartwick in northeast Houston, Johnson or Fields saw a man at a carwash. Johnson asked to get out of the car, and he and Fields approached the carwash. Appellant left, then heard a gunshot and returned to the carwash. She picked up Johnson and Fields, who entered her car carrying their "black bandana masks," and then she drove them to Fields' home.

Sergeant Motard testified that he developed the belief that appellant was possibly culpable for the killing of Davis during his questioning of appellant regarding that case, but he never gave her *Miranda* warnings. Motard also testified that while he was questioning appellant that day he offered her food and drink and told her that she was not under arrest. She did not call her mother. After she had given her second written statement, Sergeant Motard spoke with Officer Abbondondalo, who had taken the statement of Johnson, who was in custody in the same office. Motard then asked appellant if she would like to speak with Johnson, which she did. Shortly after she gave her second statement, Sergeant Motard, Detective Brown, and Officer Abbondondalo took appellant home, between 10:00 and 11:00 p.m.

Appellant's mother testified that she tried to contact appellant on her cell phone but did not get any kind of response.

Appellant testified that when the police came to her place of work they asked if she had a black Nissan Sentra. When she said she did, they asked to see her car and she took them to it. She signed the consent-to-search form they gave her because the officers told her "it was for them to bring my car downtown because I wasn't allowed to drive it myself." She did not believe that she could leave the patrol car or that she was free to go, and the police

and the evidence obtained by the Humble P.D. homicide investigators, and Fields was arrested that same day. *Fields*, 2009 WL 723992, at *2.

did not tell her that she was. They asked her to go to police headquarters, and she went with them because she "felt like I had to go with them because they told me to." They took her to an interview room at the police station. She did not believe she could leave, and the police did not tell her she could. The police took her cell phone and did not give her an opportunity to call her mother or anyone else. The officer told her that if she cooperated and signed the statement she could go home, but she was not allowed to go home. Appellant did not believe that she was under arrest, "but I did believe I had to do what they asked me to," and she did believe she was in their custody and was not free to go home. She signed her first written statement affirming, "I have been told that I am not under arrest. I willingly signed a consent to search for officers to search my black Nissan."

Appellant testified that after she signed the first written statement she stayed in the interview room, and the officer would ask her questions and then leave and come back and ask more questions. On one of these occasions, he left the room and came back and said someone had informed him that she was the driver in the Brady Davis case. At first only Sergeant Motard questioned her about the Davis case, but just before she gave the second statement he was joined by a second officer who asked her if she was the driver. Her mental state during the second statement was the same as during the first: she was scared and believed she had to do what the officers wanted her to do. She told the officers she was the driver during the Davis murder when she gave the second statement.

### 3. Third Recorded Oral Statement

Sergeant Motard testified that the next day, June 24, he, Officer Abbondondalo,

and Detective Brown met to compare notes on what everybody had said about the Aparece/Ngo murders and the Davis murder. Appellant's statements had contradicted the statements of suspects Alvie Butler, Timothy Randle, and Dexter Johnson by failing to place her brother, Louis Ervin, at the Aparece/Ngo murder scene. Sergeant Motard, Officer Abbondondalo, and Detective Brown returned to appellant's home about 12:45 p.m. and asked her to return to the police station with them to "rehash" her previous statements about the Aparece/Ngo and Davis murders and to resolve some discrepancies. Appellant was still in her pajamas. She returned to police headquarters with them in their Ford Taurus.

Sergeant Motard further testified that he took the interview and recorded it. He began by reading appellant her *Miranda* rights. Appellant waived her rights and gave the statement. After questioning, which concluded at 1:44 p.m., appellant was taken to the unsecured "family room," where the officers told her that her family was waiting. Sergeant Motard testified that appellant's brother Louis had been brought in for questioning, and appellant was asked to wait pending an "opinion on all this" from the District Attorney's Office. Sergeant Motard testified that appellant remained unguarded while she waited and was free to leave at any time. The police placed appellant in custody after they were told that Officer T. Miller had obtained a probable cause warrant against appellant. Sergeant Motard walked her back to his office, where she had made her statements the day before, filled out paperwork, and called the patrol unit. When it came, appellant was handcuffed for the first time and taken to jail.

### 4. Trial Court's Denial of Motion and Findings

Appellant's counsel argued that all three of appellant's statements were custodial

statements for which she was not given *Miranda* warnings and that the third oral recorded statement was "potentially fruit of the poisonous tree because Sergeant Motard had indicated that a lot of the information that he asked about on the oral statement was what he had gathered from the statement on the day before." At the close of the suppression hearing, the trial court denied appellant's motion to suppress. The court made specific findings that appellant was not in custody when she gave her first two written statements and that, although she was in custody when she gave her taped oral statement, the statement met the requirements for admissibility. The court also found that the two written statements were not custodial statements and that, therefore, "there would be no fruit of any poisonous tree."

On appeal, appellant's counsel filed a motion to supplement the record with written findings of fact by the trial court. This Court granted the motion and the trial court provided findings of fact. The trial court found that appellant's first two statements were non-custodial; it found that the third statement was custodial and that appellant had been informed of her rights under article 38.22 of the Code of Criminal Procedure and *Miranda*, and that she knowingly, intelligently, and voluntarily gave up those rights. The trial court further found that the police officers did not suspect appellant in either the Aparece/Ngo case or the Brady Davis case when they questioned her and that appellant gave her statements knowingly, intelligently, and voluntarily. The trial court's findings also indicated that although appellant was not able to open the doors of the police vehicle in which she was transported she was informed that she was not obligated to speak with the officers and that she could leave at any time. The trial court's findings also indicated that appellant "re-mained at the station from approximately 6:00 p.m. until approximately 10:00 p.m." on the day she provided her first two statements. The trial court found Sergeant Motard and Officer Arnold to be credible witnesses and appellant to be a non-credible witness.

## C. Trial

At trial, the State offered both redacted and non-redacted versions of appellant's first written statement. Appellant objected to the admission of both as being in violation of the Fourth and Fifth Amendments to the United States Constitution and applicable sections of the Texas Constitution, as well as articles 38.21, 38.22, and 38.23 of the Texas Code of Criminal Procedure. The court admitted the redacted version of her first written statement with references to the Aparece/Ngo murders omitted. The court overruled appellant's objection to the admission of the redacted first written statement but gave her a running objection. The State then tendered appellant's second written statement. Appellant repeated her objections under the Fourth and Fifth Amendments to the United States Constitution, the Texas Constitution, and articles 38.21, 38.22, and 38.23 of the Texas Code of Criminal Procedure. The court overruled the objections and gave appellant a running objection. The court then permitted the State to read the two admitted written statements into the record verbatim.

The redacted version of appellant's first, un-*Mirandized* written statement, signed at 7:05 p.m. on June 23, as read into the record, stated that appellant had consented to the search of her black Nissan, that she had known Dexter Johnson since she was a child, and that Keithron Fields was her boyfriend. Appellant's second un-*Mirandized* written statement, given on the evening of June 23 at 8:31 p.m., contained

a complete description of all the events in which appellant had participated on the evening of Davis's murder.

The statement provided that, about three weeks before the date of her statement, appellant, Dexter Johnson, and Keithron Fields had been out all night. Dexter was driving her car, and Keithron was in the front seat. Appellant fell asleep on the back seat while they were driving around. She woke up when she heard the door slam. Keithron was getting back in the car with his jacket on with the hood up. He told Dexter that "the woman didn't have any money, but he did have her wallet." They threw the wallet away and drove off, "looking for someone to get money from." There was no one to get money from, so Dexter stopped and let appellant drive.

When appellant stopped at a light they saw a carwash on the corner with a man washing a large truck. Dexter asked appellant to let Keithron and him out there. She did, knowing "they were going to rob someone in the carwash." She drove around for two or three minutes, during which time she heard one loud gunshot from the carwash. She returned and picked up Dexter and Keithron, who were standing in the street with their hoods up and holding their black bandana masks. They were out of breath, as if they had been running. They got into the car, and they all returned to Keithron's house, where "Dexter turned the TV news on to see what they were showing." In her statement, appellant said that Dexter told her, " 'The man elbowed me like he was going take off and run.' He said, 'That is why I had to shoot him.' " The same day Keithron told her the same thing. They were both only a little nervous. They did not get any money either from the lady at the bus stop or from the man at the carwash. She knew they both had guns.

The statement also said that, on the weekend of June 10, 2006, appellant let Keithron borrow her car. He took her to work and later called her to say that he was in her "home area hanging with a group of guys when the police showed up." They asked permission to look in the car, and Keithron told them it was okay. Because he and Dexter knew the police would find marijuana, they "took off running." The police towed her car, searched it, found the drugs and found one gun, "but they did not find the .380 that under the back seat." When she got the car back, Dexter asked for the gun, and she sent it back to him.

The statement ended with appellant's statement that she had been informed that under section 37.02 of the Texas Penal Code a person commits the offense of perjury "if with the intent to deceive and with knowledge of the statement's meaning, he or she makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath." The statement did not contain a statement that appellant had been warned of her *Miranda* rights.

Sergeant Motard testified that, after appellant signed the second written statement, he allowed her to walk down the hall and talk with Dexter Johnson, who was in custody. When asked about her mental state, he testified that "[s]he had gotten emotional even before she went down there and was teared up and that kind of thing." After she met with Johnson, and "once [Officer] Abbondondalo finished with Dexter Johnson," Sergeant Motard and Officer Abbondondalo drove appellant home.

Sergeant Motard further testified that the next day the officers went looking for Keithron Fields, and they went to locate appellant and "speak with her again about

her statement the previous night" in order to clear up "some discrepancies between her statement and the other statements that were made." Sergeant Motard, Officer Abbondondalo, and Detective Brown took her downtown in their car to police headquarters, where Sergeant Motard read her her *Miranda* rights and recorded the interview. After she gave her recorded statement, Sergeant Motard asked her to wait while the investigators "ran this whole thing by the DA's office." When he was advised that the police had obtained a warrant for appellant's arrest, Sergeant Motard informed her family that appellant had to "stay with us." He went to his cubicle and filled out the paperwork and "called the unit to come and they did."

The State also offered the *Mirandized* recorded interview into evidence at the trial. Appellant objected on the basis of "the fruit of the poison tree, that this was produced from the written statement that was given before" and on the basis of "all the same reasons" that had been previously given. The trial court overruled the objection and gave appellant a running objection to the recording. After the State had confirmed with Sergeant Motard that he had read appellant her *Miranda* rights before taking the recorded statement, the State played the recording to the jury.

Sergeant Motard testified on cross-examination that when appellant was brought in for questioning on June 23, he did not know whether appellant had her cell phone, but he did not tell her she could use the telephone. He also testified that, prior to taking her first written statement, at 7:05 p.m. on June 23, he would leave her presence for periods of time to see whether "her version of events comported with the version of events that the other guys were [telling]." He did not consider her a suspect, although, "I felt that she could be

criminally culpable." He did not get any "specific information" indicating that she was the driver on the Davis case until she told him "while we were working on the second statement." He thought appellant was "possibly culpable," but he did not read her her *Miranda* rights at that time.

Sergeant Motard further testified that the second written statement, begun at 8:31 p.m. on June 23, "almost resembles the taped part." However, when appellant's counsel pointed out that "on the tape I noticed that she would give you a narrative and then you would then give additional information and ask her if it was true or correct," Sergeant Motard testified,

> Well, in that particular instance she's— I'm already working off the second statement. All I'm doing really in that second statement on the tape was confirming what she said in her first, in her typed written statement because there was—as we pointed out earlier, there was a discrepancy already in the first statement she gave, State's 7.

State's exhibit 7 was appellant's first written statement, containing her description of the Aparece/Ngo murders, which was not admitted.

Sergeant Motard further testified that when he read appellant her *Miranda* rights at the beginning of her recorded oral statement on June 24, he had the same feeling with respect to appellant's "possible culpability" he had had the day after her second written statement and during that statement when he determined that she had at some point driven the car at the Davis killing. He also testified that when he took appellant's recorded statement on June 24 he would listen to her for a while and then would paraphrase and add some additional information ascertained during the course of the investigation. The recorded statement was "a little different in that, as I said, all I was doing

was just trying to clarify was this accurate; was the statement she gave me about Brady Davis, was that accurate from the day before." His impression was that Davis "was a target of opportunity," that Johnson saw it, and that he directed appellant over to it.

In addition to Sergeant Motard's testimony, the jury heard the testimony of Reginald Pettis, who lived next door to the carwash. He testified that he was in bed sleeping around 6:15 or 6:30 a.m. on May 26 when he heard a gunshot and looked out the window and saw Brady Davis's truck. He did not see anyone leaving the location. When the truck did not move after 10 to 15 minutes, he got dressed and walked to the carwash, where he found Davis lying partially under the truck. Davis was still alive, bleeding from the lower part of his body, with his eyes closed. Pettis told him help was on the way and called 911. A middle-aged man he did not know came up and returned with the victim's wife and son.

Carl Herbert testified that he lived about three blocks from the carwash. Herbert got up about 5:30 a.m. on May 26. He knew Davis because he worked with him at North Forest Independent School District. While he was outside warming up his truck to go get coffee at the Shell station as he did every morning, Davis stopped by and mentioned he was going to the carwash to wash out his barbeque pit, which was in the truck. Herbert told Davis he was going to the Shell station to get coffee. When he left to get coffee, he saw Davis at the carwash and spoke to him. When he returned, about fifteen minutes later, Davis was lying on the ground. Herbert blew his horn, but Davis did not answer. He got out of the truck and touched him, and Davis opened his eyes and smiled and turned around, and Herbert saw he had been shot. Herbert

told him he was going to get Davis's wife and return. When he got back with Davis's wife and son, the ambulance was there and Davis was dead. He did not see anybody else there when he first got to the carwash.

Officer D. Nunez, a crime investigator for HPD, testified that he arrived at the scene a little after 7:00 a.m. and met with the patrol officer who had been first to arrive. They identified the evidence, did a scene video, and took photographs, to which he testified. He processed a beer can at the scene but found no fingerprints. He found blood stain evidence indicating the deceased had been standing by the front right passenger door when he was shot. The bullet that entered Davis's body was recovered at the scene. He did not process the vehicle in order not to interfere with processing at the vehicle exam building. Davis's wallet and money were found in his pockets. Officer Nunez had no personal knowledge of the actual shooting.

Mary Frances Crutcher testified that she went out of her house on Raincove on the morning of May 26, 2006 about 5:20 a.m. She did not have to work that day, but she wanted to take some brownies to the bus driver on the 5:30 bus because it was his last day on the route. The bus would come up Homestead and turn on Hartwick. The bus stop was in the middle of the block on Hartwick between Raincove and Homestead. It was dark out. She stepped into the bus and the driver drove slowly up to her street with the door open as they talked. She saw a young girl walking toward them like she was trying to catch the bus, which is why she thought the driver had the door open, but the girl kept walking down the street. She had a backpack on, and Crutcher thought she was a high school kid. Crutcher thought it was strange that at that time of morning

the girl would pass the bus by, but she thought maybe somebody was going to pick her up. She did not see anyone behind her.

After the bus driver dropped her off about a house away from her house, but when she was still talking to him, Crutcher noticed someone coming up toward the bus. She thought he had gotten on, but he had passed in front. She then heard him yell, "Hey you," and thought maybe he wanted to know what time the next bus came. She turned and saw a dark figure at the corner. He was dressed all in black, and was very tall. He had on a black cap, a black jacket with a hood, and a black bandanna over his face, and he had big hands. She kept walking. He got closer and started circling in front of her, cursing and demanding money, but she told him she did not have any, that she was in her pajamas and only had her keys. He was standing under a streetlight, and she could see he had a small silver automatic pistol. He then demanded her jewelry. She did not remember she had her cross on until he reached for it, when she was about seven feet away. She said "no" and backed away. He reached again; and she backed away and said "no" again; and he turned and ran. She went in the house and called the police.

Later, Crutcher and her sister heard helicopters overhead, and she thought maybe the man who had accosted her had tried to rob somebody and they had caught him, so she went up to the carwash. There the police overheard her say, "I bet you it's the same guy that tried to rob me." They asked her to talk to homicide, and she did. Crutcher did not see the girl again. She did not see the robber get in any kind of car and did not see any cars on her street or on the street he turned onto.

Detective Brown testified that he was called to the scene of the Davis crime around 6:37 a.m. He talked to Pettis and Crutcher. He thought the attempted robbery of Crutcher was related to the Davis murder because of her description of the suspect, the weapon, the close proximity—two long city blocks away, the first street up and down one block—and the time. Crutcher told the officers the weapon was a small automatic that she thought to be a .380, and they recovered a .380 shell casing from the Davis crime scene. At first they did not have any leads, but on June 23, a statement was taken by Sergeant Motard from appellant that gave them their first significant lead. After that statement, he had the names of three people he believed to have been involved in the capital murder of Davis—appellant, Fields, and Johnson.

On cross-examination, Brown testified that, about three o'clock on the day of the crime, he received a phone call from the office transferring a woman who would not identify herself. The woman stated that she had heard a shot and had looked out of her window and seen two black males running from the direction of the carwash, looking back and waving. At that point, a black four-door that looked like a Nissan Sentra pulled up with someone else driving and picked up the two men and left the area. He did not get her telephone number and could not locate her afterwards. She said one of the men was tall and slender, and the other was considerably shorter and might be a little bit stockier, but they had hooded coats on so it was hard to tell.

J. Schraub, a latent print examiner with HPD, testified that among print cards from the black Nissan Sentra there were matches with Fields. Neither of the two print cards from the crime scene matched any of the suspects.

D. Stein, a firearms examiner with HPD, testified that a fired .380 auto car-

tridge case and a fired bullet were recovered from the crime scene.

Officer D. Arnold testified that, on June 23, he was among the officers who checked locations looking for Fields and who located appellant and asked to inspect her car. Since appellant agreed to be interviewed, "we needed to get her to the office.... So in order to be expeditious, I had a unit stop by and pick her up and drive her to 1200 Travis." He remained at her workplace to finish up, since the car needed to be transported by a city wrecker so it could be gone over by the HPD crime scene investigator. The officers took appellant's car keys so the car could be towed. He did not recall whether anyone took her cell phone. They did not tell her why they wanted to search the car.

The jury charge allowed appellant to be convicted as a principal, under the law of parties, or as a participant in a conspiracy that resulted in the death of Brady Davis. The jury convicted appellant of capital murder, and the trial court sentenced her to life in prison without the possibility of parole.

## ADMISSIBILITY OF APPELLANT'S STATEMENTS

Appellant contends in her first three issues that the trial court erred in failing to suppress her two written statements and her recorded oral statement and in admitting each of them into evidence. Appellant contends that neither her two written statements nor her recorded oral statement should have been admitted against her at trial because they were all the product of an "unlawful and prolonged" custodial interrogation that violated her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the Texas confession statute, article 38.22, section 2(a), of the Texas Code of Criminal Procedure. Specifically,

(1) appellant contends in her first two issues that the trial court erred in finding that her two written statements were not coerced or the products of an unlawful custodial interrogation and were voluntary, and (2) she contends in her third issue that the trial court erred in admitting her oral statement, as it was a continuation of the previous interrogation, and the police officers' " 'question-first-warn-later' procedures" circumvented *Miranda*, so that her "mid-stream" *Miranda* warnings at the beginning of her oral statement were meaningless under *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), *Martinez v. State*, 272 S.W.3d 615 (Tex.Crim.App.2008), and *Jones v. State*, 119 S.W.3d 766 (Tex.Crim.App. 2003). The State contends appellant was not in custody when she gave any of her statements and that she waived her objection to "mid-stream" interrogation, the subject of her third issue.

### A. Standard of Review of Motion to Supress

Individuals subjected to custodial police questioning in Texas are protected by the United States' Supreme Court decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and by article 38.22 of the Texas Code of Criminal Procedure. *Herrera*, 241 S.W.3d at 526 (stating that both article 38.22 and *Miranda* apply when persons are in custody and being interrogated). The determination of custody is the same for both *Miranda* and article 38.22. *Id.*

In *Miranda*, the Supreme Court held that "when an individual is taken into custody ... and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478, 86 S.Ct. at 1630. Consequently, such questioning requires that the person be informed of his right to remain silent and his right to an

attorney. *Id.* at 479, 86 S.Ct. at 1630. After the *Miranda* warnings have been given, a person may then knowingly and voluntarily waive his rights. *Id.* "But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Id.* Evidence obtained as a result of a custodial interrogation without such warnings and waiver is inadmissible under the Fifth Amendment. *See id.* at 494, 86 S.Ct. at 1638. It is also inadmissible under article 38.22, section 2 of the Texas Code of Criminal Procedure. *See* TEX.CODE CRIM. PROC. ANN. art. 38.22 (Vernon 2005).[5] An accused who is held in custody must be given *Miranda* warnings prior to questioning or the State is generally "required to forfeit the use of any statement obtained during that interrogation during its case-in-chief." *Martinez*, 272 S.W.3d at 619 n. 10 (citing *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612). If an accused provides a non-custodial statement, however, the trial court may admit that statement into evidence if it was given freely, voluntarily, and without compulsion. TEX.CODE CRIM. PROC. ANN. art. 38.22, § 5 (Vernon 2005).

A trial court's decision to admit or deny evidence of a confession will be overturned on appeal only when an abuse of discretion is shown. *Swain v. State*, 181 S.W.3d 359, 365 (Tex.Crim.App.2005). In reviewing a trial court's decision on the admission of a confession, we do not engage in our own factual review, and we give almost total deference to the trial court's determination of historical facts while reviewing the trial court's application of law de novo. *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim.App.2002); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex.Crim.App.2000). The trial court, as the sole trier of fact, evaluates the credibility of the witnesses and determines the weight to be given to their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex.Crim.App.2007). Appellate courts give almost total deference to a trial court's custody determination when the questions turn on an evaluation of credibility and demeanor. *Herrera v. State*, 241 S.W.3d 520, 526–27 (Tex. Crim.App.2007). Here, however, appellant has alleged that the police deliberately used a two-step interrogation technique of "question first, warn later," in a calculated way to undermine the *Miranda* warning. *See Carter v. State*, 309 S.W.3d 31, 36 (Tex.Crim.App.2010); *see also Martinez*, 272 S.W.3d at 623 (quoting *Seibert*, 542

---

**5.** Article 38.22, section 2 provides:

[N]o written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement that:

(a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this code or received from the person to whom the statement is made a warning that:

(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at this trial;

(2) any statement he makes may be used as evidence against him in court;

(3) he has the right to have a lawyer present to advise him prior to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview at any time; and

(b) the accused, prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived the rights set out in the warning....

TEX.CODE CRIM. PROC. ANN. art. 38.22, § 2(a)-(b) (Vernon 2005).

U.S. at 622, 124 S.Ct. at 2616 (Kennedy, J., concurring)).

The Texas Court of Criminal Appeals has recently expressly adopted Justice Kennedy's concurrence in *Missouri v. Seibert* for the analysis of deliberate two-step interrogations. *Carter*, 309 S.W.3d at 38; *see Seibert*, 542 U.S. at 622, 124 S.Ct. at 2616 (Kennedy, J., concurring). However, Justice Kennedy's *Seibert* concurrence provided no guidelines for conducting or reviewing a *Seibert*-deliberateness determination. *See Carter*, 309 S.W.3d at 38. Therefore, the Texas Court of Criminal Appeals, following the trend in the federal circuit courts of appeals, has adopted the clear error standard of review in making such a determination. *Id.* at 39–40. Under this standard "the question is whether the evidence shows that [the interrogating officer] deliberately employed a two-step 'question-first, warn later' interrogation technique to circumvent [the] appellant's *Miranda* protections." *Id.* at 38.

Because "the 'question of whether the interrogating officer deliberately withheld *Miranda* warnings will invariably turn on the credibility of the officer's testimony in light of the totality of the circumstances surrounding the interrogation ... [the officer's credibility] is a factual finding entitled to deference on appeal' and reviewed only for clear error." *Id.* at 39. Thus, "the accused's *Miranda* rights protections turn on whether the trial court finds an arresting officer's questioning prior to the advisement of *Miranda* rights was inadvertent or intended to acquire an advantage in the interrogation process." *Id.* Thus, specific factual finding by the trial court regarding the officer's credibility is of great assistance to the reviewing court. *Id.*

The Court of Criminal Appeals held in *Carter*:

[T]he standard of review of a trial court's finding of intent "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). *Factual findings concerning intent or deliberateness should not be disturbed by an appellate court absent contradicting extrinsic evidence or internal inconsistencies that render testimony "implausible on its face."* *Id.* This standard is similar to our "great deference" standard of review for all factual findings, including intent, if such findings are supported by the record. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997) (appellate courts should afford almost total deference if the resolution of an ultimate question turns on an evaluation of credibility and demeanor).

*Id.* (emphasis added). The court observed, "[T]he trial court is the 'sole and exclusive trier of fact and judge of the credibility of the witnesses,'" particularly when a motion to suppress is based on the voluntariness of a confession. *Id.* at 41–42. Therefore, the appellate courts "must give great deference 'to the trial judge's decision to admit or exclude such evidence, which will be overturned on appeal only where a flagrant abuse of discretion is shown.'" *Id.* at 42 (citing *Delao v. State*, 235 S.W.3d 235, 238 (Tex.Crim.App.2007)).

## B. Appellant's First and Second Written Statements

In her first and second issues, appellant contends her first and second written statements were custodial statements given without the protection of adequate *Miranda* warnings.

In Texas, determinations of whether an adult is in custody are made by asking

whether a reasonable person in the same circumstance would "believe that his freedom of movement was restrained to the degree associated with formal arrest." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex.Crim.App.1996) (citing *Stansbury v. California*, 511 U.S. 318, 325, 114 S.Ct. 1526, 1530, 128 L.Ed.2d 293 (1994)). At trial, the appellant has the initial burden of establishing that he is "in custody" for *Miranda* purposes. *Herrera*, 241 S.W.3d at 526, 532. A determination of custody requires a court to examine all of the objective circumstances surrounding the questioning and to determine whether in those circumstances a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave. *Dowthitt*, 931 S.W.2d at 254–55. Ultimately, "the determination of custody must be made on an ad hoc basis, after considering all of the (objective) circumstances." *Id.* at 255 (citing *Shiflet v. State*, 732 S.W.2d 622, 629 (Tex.Crim.App.1985)).

Prior to *Stansbury*, the Texas Court of Criminal Appeals recognized four factors as relevant to determining custody: (1) probable cause to arrest; (2) the subjective intent of the police; (3) the focus of the investigation; and (4) the subjective belief of the defendant. *Dowthitt*, 931 S.W.2d at 254. After *Stansbury*, it held that factors (2) and (4), the subjective intent of law enforcement officials and the subjective belief of the defendant, are irrelevant unless that intent is somehow communicated or otherwise manifested to the suspect. *Id.; see Stansbury*, 511 U.S. at 322, 114 S.Ct. at 1530; *Dancy v. State*, 728 S.W.2d 772, 778 (Tex.Crim.App.1987).

In *Dowthitt*, the Court of Criminal Appeals provided four sets of circumstances in which an interrogation may be considered custodial:

(1) when the suspect is physically deprived of his freedom of action in any significant way; (2) when a law enforcement officer tells the suspect that he cannot leave; (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect he is free to leave.

931 S.W.2d at 255. The fourth circumstance also requires that the officer's knowledge of probable cause be communicated to the suspect and that the "manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest" for custody to be established. *Id.*

Appellant contends that she was in custody when she made her first statement because she was physically deprived of her freedom of action when police officers created a situation that led her to believe her freedom of movement had been restricted. Specifically, appellant contends that the warrantless seizure of her car, the seizure of her keys and cell phone, her young age and inexperience, her transportation to police headquarters in a locked patrol car, and the incriminating statements she made created a totality of circumstances that made her statements custodial for *Miranda* purposes. *See id.* at 255.

The Texas Court of Criminal Appeals has considered cases like this twice in recent years. In *Dowthitt*, the appellant went to the sheriff's office to give a written statement about a double murder in which only appellant's son, and not appellant himself, was a suspect. 931 S.W.2d at 252. No *Miranda* warnings were given. *Id.* Appellant finished, signed the statement, left for lunch, and then returned and asked to change his statement because it contained a false alibi. *Id.* At this point, the

appellant was interviewed over a five hour period until 6:00 p.m., when his second statement was signed, also without *Miranda* warnings. *Id.* Because of inconsistencies between his two statements, the appellant was asked to take a polygraph test, which he did, finishing about 11:00 p.m. *Id.* The polygraph test was recorded on videotape. *Id.* When the polygraph was finished, the polygraph operator told the appellant that he had not told the complete truth about everything, and he brought the detective back in. *Id.* The appellant was then intensively questioned on videotape for two more hours until he wrote and signed a statement placing himself at the scene of the crime. *Id.* at 252–54. The appellant was then taken to the detective's office to work on his third written statement, which was signed at 3:55 a.m. *Id.* at 254. No *Miranda* warnings were given until the statement was completely written, but appellant was given his *Miranda* warnings three times before he signed the third statement. *Id.*

The Court of Criminal Appeals held that the appellant was not a suspect when he came voluntarily to the police station, but he became one as the interview progressed. *Id.* at 256. While the appellant had been told that he was not a suspect at 7:00 p.m., the court held that it was apparent that he had become a suspect by 1:00 a.m., at the beginning of the polygraph examination. *Id.* When he was told around 1:30 a.m. that he was not going to be permitted to leave, "This express assertion itself amounted to an arrest." *Id.* However, even though the appellant never expressed a desire to leave and was not told he could not leave until 1:30 a.m., he was in custody from the time he admitted he was present during the murder, around 1:00 a.m., because, after this admission, "the police had probable cause to arrest." *Id.* The "crucial admission" that the appellant was present during the crime turned the non-

custodial encounter into a custodial one. *Id.* The court stated:

> While appellant did not admit to committing the offenses, his admission that he was present during the murders was incriminating, and a reasonable person would have realized the incriminating nature of the admission. Given the length of the interrogation, the existence of factors involving the exercise of police control over appellant (accompanying appellant at restroom breaks, ignoring requests to see his wife), and appellant's damaging admission establishing probable cause to arrest, *we believe that "custody" began after appellant admitted to his presence during the murders.*

*Id.* at 257 (emphasis added).

Under similar circumstances in *Jones v. State*, the Texas Court of Criminal Appeals held that the appellant was "clearly in custody" for purposes of *Miranda*. 119 S.W.3d 766, 771–72, 776 (Tex.Crim.App. 2003). The defendant in that case was under arrest and incarcerated for outstanding traffic warrants and for possession of a controlled substance when he was interviewed. *Id.* at 771. While incarcerated, he had given two statements implicating himself in a murder and had received *Miranda* warnings for both. *Id.* Nine or ten days later, he was questioned while in jail about two extraneous murders on the basis of information obtained by investigators. *Id.* He was not given *Miranda* warnings before being confronted with the statements of his "good friend, Ricky 'Red' Roosa," and told that Roosa had named him as "primarily responsible for the murders." *Id.* The Court of Criminal Appeals stated:

> At that point, appellant orally admitted his involvement in the two murders. As appellant confessed and described details of the offense, [Texas Ranger A.]

Akin wrote down "verbatim" what appellant said on a statement form, asking questions and transcribing the answers as they went along. The entire interview lasted about an hour-and-a-half. When appellant finished his story, Akin got up, sat down next to appellant, and went over the legal rights that appeared at the top of the written form. Then Akin and appellant read the statement together and appellant corrected mistakes, initialed revisions, and signed the statement at the bottom.

*Jones*, 119 S.W.3d at 771–72.

The Court of Criminal Appeals contrasted the circumstances in *Jones* with the controlling United States Supreme Court case on the admissibility of unwarned statements, *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222, (1985), in which the defendant was held not to be in custody when he gave an incriminating statement. The Court of Criminal Appeals observed,

[T]he unwarned and warned statements in this case were given during a nearly undifferentiated single event, taking place in the same room as an uninterrupted and continuous process. The written Akin statement was literally a transcription of appellant's unwarned oral statements. Appellant did not make a second statement after he finally received his *Miranda* warnings; he simply signed the written statement that he had dictated to Akin before he was warned.

119 S.W.3d at 775. The court stated:

Appellant was incarcerated in the Tarrant County Jail under suspicion for capital murder when he was transported to another part of the jail in the early hours of the morning to meet Ranger Akin and another officer. He was taken to a small (approximately 8' × 12') interview room to meet with two officers

who informed him that they were investigating the Sanders and Peoples murders. After five or ten minutes, Akin asked appellant what he would think if "they" had been told by appellant's good friend "Red" that appellant had the "primary responsibility" and was the "bad guy" in the two murders. *This was a classic police "interrogation" environment. Under these circumstances, appellant was clearly in custody for purposes of Miranda when he gave the Akin statement.*

*Id.* at 776 (emphasis added).

The trial court expressly found, following the hearing on appellant's motion to suppress, that appellant's first two written statements were non-custodial. It further found that the police officers did not suspect appellant in either the Aparece/Ngo case or the Brady Davis case when they questioned her and that appellant gave her statements knowingly, intelligently, and voluntarily. The court found that although appellant was not able to open the doors of the police vehicle in which she was transported, she was informed that she was not obligated to speak with the officers and that she could leave at any time. It also found that appellant "remained at the station from approximately 6:00 p.m. until approximately 10:00 p.m." on the day she provided her first two statements. Finally, the trial court found Sergeant Motard and Officer Arnold to be credible witnesses and appellant to be a non-credible witness.

All of these findings went to the issues of custody and the officers' intent, hence to the voluntariness, and therefore the admissibility, of appellant's statements. Thus, I would review the trial court's findings under the clear error standard set out in *Carter* to determine whether "contradicting extrinsic evidence or internal inconsistencies ... render [the] testimony" going to the issues of custody and the officers'

intent, on which the trial court's credibility findings were based, " 'implausible on its face,' " and, therefore, whether the trial court "clearly erred" in finding the officers' testimony credible and appellant's contradictory testimony not credible. *See Carter,* 309 S.W.3d at 38 n. 39, 39.

Sergeant Motard testified at the suppression hearing that police originally sought appellant on June 23 for questioning about Fields' involvement in the Aparece/Ngo crime because they knew Fields and appellant dated, they had information that her car might have been involved in that crime, and they had been asked to confirm that she owned a black Nissan. He further testified that appellant was not handcuffed, that her cell phone and keys were not taken from her, and that the officers did not consider her in custody but were just trying to locate Fields and "were hoping that she was just simply a witness." The trial court found Sergeant Motard's testimony to be credible.

At trial, Sergeant Motard testified that he had received information on the day of the Davis killing that a black Nissan Sentra had pulled up and picked up the two men seen running from the carwash and had left the area. In other words, he testified that he knew on May 26 that someone other than the two black males seen running from the carwash had been driving the black Nissan Sentra that picked them up. Sergeant Motard also testified at the suppression hearing that the police were seeking appellant on June 23 only to ask her about Fields and about her car. But he also testified at that hearing that the police who were seeking her were part of the HPD Gang Murder Unit headed by Detective Brown, which had been gathering information about the Aparece/Ngo missing persons' case. All witnesses in appellant's suppression hearing and trial agreed that appellant's car

was seized and towed from her workplace without a warrant and without any reason being given, but with her consent. Appellant testified at the suppression hearing that the officers told her to sign a consent form to search her car because "it was for them to bring it downtown because I wasn't allowed to drive it myself." The evidence is undisputed that appellant was transported to police headquarters in a locked and secured patrol car, was not told she could leave, and could not have left without asking and being let out by the police who had towed her car. Appellant testified that her cell phone was taken from her, and her mother testified that she tried to call appellant on her cell phone but could not reach her. The trial court found that appellant's testimony at the hearing was not credible, and it found that Sergeant Motard's testimony at the suppression hearing that her cell phone and keys were not taken from her and that she could have left the police car was credible.

Appellant did not testify at trial. However, Officer Arnold testified at both the suppression hearing and at trial. At trial, he testified that the officers took appellant's keys so the car could be towed by a city wrecker so it could be searched by the HPD crime scene investigators. He also testified that when appellant agreed to be interviewed "we needed to get her to the officer" expeditiously, so he called a police car to transport her. And Sergeant Motard testified that when appellant was brought in for questioning on June 23 he did not know whether she had her cell phone, but he did not tell her she could use the telephone.

The evidence at appellant's trial further showed that appellant was taken directly from her work to police headquarters to give her statement to a uniformed police officer in an interview room down the hall from where the other suspects in the Apa-

rece/Ngo disappearance and murder cases and in the Davis murder case were being held in custody and interrogated for these crimes, with the results of their warned interrogations and appellant's unwarned interrogation being systematically checked against each other throughout the evening.

Sergeant Motard testified at appellant's trial that, prior to taking her first written statement (regarding the Aparece/Ngo murders) at 7:05 p.m., he would leave appellant for periods of time to see whether "her version of events comported with the version of events that the other guys were [telling]," and that "I felt that she could be criminally culpable." He also testified that he did not tell appellant she could leave. Rather, after appellant signed the first statement he told her, "Let me just check with these other guys and see how this whole thing is—you know, what your information is versus what they're remembering." He then left the workstation, met with Detective Brown and the team investigating the Davis killing and the Aparece and Ngo killings, told them her statement "sounded pretty good," and compared notes on what the other investigators were learning from their interviews with the suspects in custody.[6] According to Sergeant Motard's trial testimony, Detective Brown suspected appellant might "have information on" the Davis case and asked Motard to continue questioning her to try to get information on that case. Sergeant Motard testified at the suppression hearing that he and appellant discussed the Davis killing before he took the second written statement. He testified at trial that he did not get "specific information" indicating appellant was the driver on the Davis case until she told him "while we were working on the second statement." Although he thought she was "possibly

culpable" at this point, he did not read her her *Miranda* rights.

Detective Brown testified at appellant's trial that the HPD team investigating the Davis murder did not have any leads at first. Appellant's statement, taken by Sergeant Motard on June 23, gave them their first significant lead. After that statement, he had the names of three people he believed to be involved—appellant, Fields, and Johnson.

Appellant's testimony at the suppression hearing regarding the sequence of events corresponds to Detective Brown's, Sergeant Motard's, and Officer Arnold's trial testimony. She testified that between the time she signed her first written statement at 7:05 p.m., and the time she gave her second written statement, Sergeant Motard would ask her questions, then would leave and come back and ask more questions. On one occasion he left the room and came back and said someone had informed him that she was the driver in the Davis case. Appellant also testified at the suppression hearing that Sergeant Motard was joined by a second officer "just before" the start of her second written statement at 7:05 and that that officer asked her whether she was the driver in the Davis murder. At the time she gave her second statement she did not believe she was under arrest, but she did not believe she was free to leave. Appellant also testified at the hearing that she was scared during both statements and believed she had to do what the officers wanted her to do. Sergeant Motard's testimony at trial confirmed appellant's emotional state after she had given her second statement as being one in which "[s]he had gotten emotional . . . and was teared up and that kind of thing."

---

**6.** This testimony is corroborated by the time lines in the *Johnson* and *Fields* opinions. *See*

*Johnson,* 2010 WL 359018, at *2–3; *Fields,* 2009 WL 723992, at *2.

According to the undisputed testimony, appellant was never read her *Miranda* rights until the recording was started on her third statement. The only warning she was given prior to that was the warning recited in her second written statement that a person commits the offense of perjury "if with the intent to deceive and with knowledge of the statement's meaning, he or she makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath." And Sergeant Motard repeatedly testified at trial that the only reason for taking the recorded oral statement was to clarify whether the written statement that appellant had given about Davis the day before was accurate. That recorded oral statement was immediately used to procure an arrest warrant while appellant was detained at police headquarters, and the warrant was immediately served upon her as she waited with Sergeant Motard for a police unit to arrive to take her from police headquarters to jail.

Following the suppression hearing at which Sergeant Motard, Officer Arnold, and appellant testified, the trial court found that appellant was not in custody when she gave her first and second written statements and that, although she was in custody for the third, recorded statement, the statement met the requirements for admissibility because appellant had been informed of her rights and knowingly, intelligently, and voluntarily gave them up. The court also found that the officers did not suspect appellant in either the Aparece/Ngo case or the Davis case when they questioned her. It found that although appellant could not open the doors to the police car in which she was transported to HPD headquarters, she was informed that she was not obligated to speak with the officers and could leave at any time. Finally, the trial court found that appellant's testimony was not credible and that Sergeant Motard's and Officer Arnold's testimony was credible.

Sergeant Motard's and Officer Arnold's testimony on the issues of intent and indicia of custody at trial, however, along with the other evidence recited above, demonstrates that the testimony was internally inconsistent, and therefore these findings were clearly erroneous. Thus, I would not defer to the trial court's findings, but would review the totality of the evidence to determine whether it shows that appellant was in custody when she gave each of her statements and whether it shows that the interrogating officers deliberately employed a two-step question first, warn later interrogation technique to circumvent her *Miranda* protections, and, thus, whether her three statements should all have been excluded. *See Carter*, 309 S.W.3d at 38.

Under *Dowthitt* and the Supreme Court's opinion in *Stansbury*, a person is in custody if (1) he is significantly deprived of his freedom of action in some way; (2) a law enforcement officer tells him he cannot leave; (3) law enforcement officers create a situation that would lead a reasonable person to believe his freedom had been restricted in a significant way; and (4) there is probable cause to arrest and law enforcement officers do not tell the suspect he is free to leave. *Dowthitt*, 931 S.W.2d at 255.

I would conclude that all four of the indicia of custody were satisfied before appellant gave her first written statement. Specifically, I would conclude that appellant was significantly deprived of her freedom of action by having her keys taken and her car towed, being placed in a locked and secured police car that she could not exit without asking to leave, not being told she could get out of the car, having her cell phone taken, not being told she could

make a telephone call, being taken to police headquarters to be interviewed at the desk of a member of the HPD Gang Murder Unit down the hall from suspects in custody for the same crimes, and not being told that she was free to leave. *See Dowthitt,* 931 S.W.2d at 255. I would also conclude, on the basis of the same evidence, that the law enforcement officers had created a situation that would lead a reasonable person in appellant's situation to believe her freedom had been restricted in a significant way. *See id.*

Even assuming, however, that the foregoing indicia of police control were not sufficient to constitute a custodial situation, I would hold that the situation soon became custodial under both *Jones* and *Dowthitt* when, before she gave her first written statement at police headquarters, appellant orally provided information indicating that she was present for the murders of Ngo and Aparece. *See Jones,* 119 S.W.3d at 771–76 (holding appellant was in custody when officers asked him what he would think if police investigating murders had been told his "good friend" had said he had "primary responsibility" for two murders); *Dowthitt,* 931 S.W.2d at 257 (holding custody began when appellant admitted to his presence during murders). At that point, the officer conducting the interview, Sergeant Motard, clearly had probable cause to arrest appellant, but he did not interrupt the interview at that time to read appellant her *Miranda* rights, nor did he discontinue the interview. *See Jones,* 119 S.W.3d at 771–77; *Dowthitt,* 931 S.W.2d at 257. Nor did he communicate to appellant his knowledge of probable cause, as he was required to do. *See Dowthitt,* 931 S.W.2d at 257. Rather, he reassured her that she was *not* under arrest. Appellant then provided a written statement, which included an explicit statement that she had been told she was not under arrest.

These circumstances parallel those in *Jones,* in which the Court of Criminal Appeals found that the appellant was in custody when he gave his un-*Mirandized* statements. *See Jones,* 119 S.W.3d at 771–72. Specifically, after being confronted with the statements of his "good friend, Ricky 'Red' Roosa," and told that Roosa had named him as "primarily responsible" for the murders about which he was being questioned in jail, the appellant orally admitted his involvement in the two murders. *Id.* at 771. As he confessed and described the details of the offense, the officer questioning him "wrote down 'verbatim' what appellant said on a statement form, asking questions and transcribing the answers as they went along." *Id.* After an interview lasting about an hour-and-a-half, the officer "got up, sat down next to appellant, and went over the legal rights that appeared at the top of the written form. Then [he] and appellant read the statement together and appellant corrected mistakes, initialed revisions, and signed the statement at the bottom." *Id.* at 772.

Also paralleling this case, the Court of Criminal Appeals observed in *Jones* that "the unwarned and warned statements . . . were given during a nearly undifferentiated single event, taking place in the same room as an uninterrupted and continuous process." *Id.* at 775. In that case, "[t]he written . . . statement was literally a transcription of [the] appellant's unwarned oral statements," and "[the a]ppellant did not make a second statement after he finally received his *Miranda* warnings; he simply signed the written statement that he had dictated to [the officer] before he was warned." *Id.* Here, Sergeant Motard testified that appellant's second written statement, which he took at his workstation in the homicide division at HPD headquarters at 8:31 on June 23, "almost resembles the taped part," taken at headquarters

shortly after noon the next day. He also testified that, in taking the *Mirandized* recorded oral statement, "I'm already working off the second statement. All I'm doing really in that second statement on the tape was confirming what she said in her first, in her typed written statement."

Taking into account all of the foregoing evidence and the *Dowthitt* factors, I would conclude that the trial court clearly erred in finding on the basis of the testimony of the witnesses at the suppression hearing that the circumstances of appellant's questioning would not have led a reasonable person to assume that "that [s]he [wa]s under restraint to the degree associated with an arrest," i.e., in custody, when appellant gave her first and second written statements. *See Carmouche,* 10 S.W.3d at 333; *Dowthitt,* 931 S.W.2d at 255.

Appellant was not given the warnings to which she was entitled under the Fifth Amendment to the United States Constitution and article 38.22, section 2(a) of the Code of Criminal Procedure, once her interrogation became custodial. *See Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630; Tex.Code Crim. Proc. Ann. art. 38.22, § 2(a)-(b). Nevertheless, her interrogation continued without interruption until all the information necessary to indict her for capital murder had been obtained by law enforcement officials, checked for accuracy and completeness against information being concurrently obtained from other suspects in custodial interrogations, written down by the officer, and signed by appellant. The warnings were administered, instead, just before she gave her recorded oral statement on June 24, which was expressly solicited solely to correct discrepancies and to confirm facts previously solicited from her in her unwarned interrogations. *Cf. Jones,* 119 S.W.3d at 771–72.

I conclude that the officers took appellant into custody and interrogated her while deliberately withholding *Miranda* warnings as part of a two-step "question first/warn later" interrogation plan. *See Carter,* 309 S.W.3d at 38–40. Because no *Miranda* warnings were given before either statement was taken, I would hold that appellant's first and second written statements were taken in violation of both the Fifth Amendment to the United States Constitution and article 38.22, section 2(a) and (b) of the Code of Criminal Procedure and were inadmissible into evidence against her.

Accordingly, I would sustain appellant's first and second issues.

### C. Appellant's Recorded Oral Statement

In her third issue, appellant argues that the police deliberately withheld *Miranda* warnings prior to her first two statements and then attempted to cure this with a *Miranda* warning prior to her third statement. Appellant argues that, in so doing, the officers intentionally circumvented her constitutional rights against unreasonable search and seizure and self-incrimination under the Fourth and Fifth Amendments. Appellant contends that the *Miranda* warnings administered before her third statement were "mid-stream *Miranda*" warnings and were therefore ineffective because the third statement was a mere continuation of her first two statements.

The failure to give timely *Miranda* warnings generally results in the State's being required to forfeit the use of any statement obtained during that interrogation, including a *Mirandized* statement. *Martinez,* 272 S.W.3d at 619 n. 10 (Tex. Crim.App.2008) (citing *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612). When a defendant claims that his protections under *Miranda* were thwarted, the burden of showing admissibility of the statements rests on

the State. *Id.* (citing *Seibert,* 542 U.S. at 609 n. 1, 124 S.Ct. at 2608 n. 1).

In *Martinez,* the Texas Court of Criminal Appeals analyzed the United States Supreme Court's four-judge plurality opinion in *Missouri v. Seibert* and the concurrence by Justice Kennedy. In *Seibert,* as in *Martinez,* the appellant had challenged the admissibility of her *Mirandized* confession as the product of a question-first-*Mirandize*-after strategy. The Court of Criminal Appeals quoted the Supreme Court's plurality opinion, which stated:

> [W]hen a confession so obtained is offered and challenged, attention must be paid to the conflicting objects of *Miranda* and the question-first strategy. *Miranda* addressed "interrogation practices ... likely ... to disable [an individual] from making a free and rational choice" about speaking, 384 U.S. at 464–465, 86 S.Ct. 1602, and held that a suspect must be "adequately and effectively" advised of the choice the Constitution guarantees. *Id.* at 467, 86 S.Ct. 1602. Question-first's object, however, is to render *Miranda* warnings ineffective by waiting to give them until after the suspect has already confessed.... By any objective measure, it is likely that warnings withheld until after interrogation and confession will be ineffective in preparing a suspect for successive interrogation, close in time and similar in content. The manifest purpose of question-first is to get a confession that the suspect would not make if he understood his rights at the outset. When the warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine,* 475 U.S. 412, 424, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

*Martinez,* 272 S.W.3d at 619–20 (quoting *Seibert,* 542 U.S. at 601, 124 S.Ct. at 2603).

The Court of Criminal Appeals then quoted, and adopted, the *Seibert* plurality's multi-factor test for determining " 'whether *Miranda* warnings delivered midstream' could be effective," requiring reviewing courts to consider "[1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the over-lapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first." *Martinez,* 272 S.W.3d at 620 (quoting *Seibert,* 542 U.S. at 615, 124 S.Ct. at 2612).

The Court of Criminal Appeals noted Justice Kennedy's observation in *Seibert* that the prior controlling Supreme Court case, "*Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), should be followed unless there is proof that the interrogating officer knowingly and willingly utilized the two-stage technique, thus undermining *Miranda* warnings." *Martinez,* 272 S.W.3d at 620 (citing *Seibert,* 542 U.S. at 619, 124 S.Ct. at 2614 (Kennedy, J., concurring)). Under the *Elstad* standard, although an unwarned custodial pre-*Miranda*-warning statement is inadmissible, subsequent warned statements may be introduced against the accused when, "given the facts of the case, 'neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence would be served by suppression.' " *Id.* at 621 (quoting *Elstad,* 470 U.S. at 308, 105 S.Ct. at 1285); *see also Carter,* 309 S.W.3d at 41 (finding unwarned pre-*Miranda* questioning inadmissible but not part of deliberate two-step plan to undermine *Miranda*

rights, but finding it "still necessary to determine if appellant's post-warning statements were voluntarily made.").

When a deliberate two-step strategy is used, Justice Kennedy would have held in *Seibert* that, " 'postwarning statements that are related to the substance of pre-warning statements must be excluded unless curative measures are taken before the postwarning statement is made.' " *Martinez,* 272 S.W.3d at 626 (citing *Seibert,* 542 U.S. at 622, 124 S.Ct. at 2614 (Kennedy, J., concurring)). The Texas Court of Criminal Appeals agreed with and adopted this standard in *Martinez. Id.* The Court also adopted Justice Kennedy's conclusion that " 'curative measures ... designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver' " could render statements taken without giving *Miranda* warnings admissible. *Id.* (quoting *Seibert,* 542 U.S. at 622, 124 S.Ct. at 2616 (Kennedy, J., concurring)).

The Court of Criminal Appeals gave examples in *Martinez* of appropriate curative measures gleaned from both the *Seibert* plurality opinion and Justice Kennedy's concurrence: (1) a substantial break in time and circumstances between the unwarned statement and the *Miranda* warning; (2) the interrogating officers' explaining to the defendant the unwarned custodial statements are likely not admissible; (3) the officers' informing the suspect that although he previously gave incriminating information he is not obligated to repeat it; (4) the officers' refraining from referring to the unwarned statement unless the defendant refers to it first; and (5) the officers' telling a defendant who does refer to his pre-*Miranda* statement that he is not obligated

to discuss the content of the first statement. *Id.* at 626–27.

In *Martinez,* the Court of Criminal Appeals held that the appellant's rights were violated, that no curative steps were taken, and that his statement taken without *Miranda* warnings was inadmissible under the foregoing standard. *See id.* at 622–23, 627 (holding statement inadmissible where defendant was not given *Miranda* warnings at time of arrest; officers questioned him about crime at police station without giving required warnings; appellant was taken for polygraph examination without being given *Miranda* warnings; and magistrate read *Miranda* warnings to appellant only after both first round of interrogation and polygraph examination). The court stated, "Based on these facts, we have determined that 'the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning....' " *Id.* at 623; *see also Jones,* 119 S.W.3d at 775, 783 (holding second, warned statement that repeated first unwarned statement inadmissible because waiver of rights given in connection with second statement was not constitutionally valid in light of circumstances and entire course of police conduct, but finding error in admission harmless beyond reasonable doubt).

Here, appellant's interrogation satisfied each of the *Seibert* plurality's factors for determining that a subsequent statement is inadmissible due to a prior statement given without *Miranda* warnings. With respect to the first and second factors, after first assuring themselves during oral questioning of appellant of the answers appellant would give to both the Aparece/Ngo murders and the Davis murder, the police took two written statements. In the first statement, appellant criminally implicated herself in the Aparece/Ngo murders by giving a detailed description of the events in which she participated be-

fore, during, and after the murders. In the second statement, appellant similarly criminally implicated herself in the Davis murder, providing sufficient information to the officers to sustain an indictment for capital murder. Before either written statement was taken, between the first and second statements, and during both written statements, the interrogating officer, Sergeant Motard, repeatedly checked the information appellant gave against information being concurrently obtained in the interrogation of the male suspects in custody and admittedly supplied information he had learned from the other interrogations to appellant and asked her to confirm it.

In addition, in taking her oral recorded statement after administering *Miranda* warnings, Sergeant Motard confronted appellant with inconsistencies between that statement and her second written statement to assure the completeness and detail of her statements in the first and second rounds of interrogation. *See Martinez,* 272 S.W.3d at 620; *see also Seibert,* 542 U.S. at 615–16, 124 S.Ct. at 2614. He then testified that the purpose of the oral recorded statement was to confirm the information in the second statement. Not only was the content of the statement for which appellant received *Miranda* warnings "over-lapping," it was intended to be identical, and the content of the subsequent statement was repeatedly checked against the content of the prior statement during the recorded interview. *See Martinez,* 272 S.W.3d at 620; *see also Seibert,* 542 U.S. at 615–16, 124 S.Ct. at 2614.

With respect to the third and fourth factors, there was no difference in the setting of the three statements, the time was continuous except for the time appellant was allowed to sleep at home, and there was complete continuity of police personnel. *See Martinez,* 272 S.W.3d at 620, 626–27; *see also Seibert,* 542 U.S. at 615–16, 124 S.Ct. at 2614. Viewing all of the evidence, I would conclude that the first written statement was taken at Sergeant Motard's desk at police headquarters after appellant had been deprived of her car, her keys, and her cell phone. The second was taken by Sergeant Motard as soon as her statements from the first written statement were compared with statements being obtained from the male suspects in custody down the hall, appellant had been asked if she was the driver in the Davis case, and appellant had discussed with Sergeant Motard what she would tell him; the third, recorded, statement followed the next day in the same place with the same officer after appellant had been given time to sleep at home.

Finally, the interrogator's questions treated the second round of questioning on June 23 as entirely continuous with the immediately preceding first round, and the interrogator's questions treated the third round on June 24 as continuous with both the first and second round, and as merely confirming information supplied by appellant and recorded in her unwarned second written statement the previous day. *See Martinez,* 272 S.W.3d at 620; *see also Seibert,* 542 U.S. at 615–16, 124 S.Ct. at 2614.

I would conclude that, by any objective measure, the process used to obtain appellant's statements satisfies the knowing and intentional "two-step" process of "question first, warn later" held to be an unconstitutional violation of Fifth Amendment rights in *Seibert* and *Martinez.* *See Martinez,* 272 S.W.3d at 619–26 (setting out law and applying standard to facts of case); *see also Seibert,* 542 U.S. at 615–16, 620–22, 124 S.Ct. at 2614–16 (same)).

None of the steps set out in *Martinez* to cure violations of *Miranda* were used in this case to cure the repeated unconstitutional violations of appellant's rights.

*See* 272 S.W.3d at 626–27. First, there was no substantial break in time and circumstances between the two unwarned statements and the *Miranda* warning immediately preceding the third, warned statement. *See id.* at 627. Second, the officers did not explain to appellant that her two unwarned written statements were likely not to be admissible before warning her and taking her third, recorded oral statement. *See id.* Third, appellant was not informed that, although she had previously given incriminating information, she was not obligated to repeat it. *See id.* Fourth, the interrogating officer did not refrain from referring to the unwarned statements unless appellant referred to them first. *See id.* Fifth, the officers did not tell appellant when she did refer to her pre-*Miranda* statements that she was not obligated to discuss the content of her first or second statement. *See id.*

Instead, the officers' conduct was exactly the opposite of each of the curative steps required. Appellant was expressly informed that her answers were being checked against her earlier statement and those of the male suspects for accuracy and completeness. She was told she could not leave police headquarters until her answers were checked against theirs. She was asked to give a second unwarned statement for the express purpose of providing information about the Davis case after she had criminally implicated herself in the Aparece/Ngo case and after the record indicates she had been asked whether she was the driver in the Davis case, a criminal act. And she was required to acknowledge in her first written statement that she had been informed that, under section 37.02 of the Texas Penal Code, a person commits the offense of perjury "if with the intent to deceive and with knowledge of the statement's meaning, he or she makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath." I would conclude that these factors clearly indicate that appellant was in custody when she gave her first and second written statements and that the interrogating officers intended to use her sworn statements in evidence against her and intended to warn her of possible perjury charges if her statements were false.

I would hold that no curative steps were taken and that appellant's recorded statement was inadmissible as the product of an intentional, knowing, and uncured two-step question first/warn later interrogation technique that violated the Fifth Amendment to the United States Constitution and article 38.22 of the Texas Code of Criminal Procedure.

I would sustain appellant's third issue. Therefore, I would turn to whether the admission of appellant's redacted first unwarned written statement, her entire second unwarned written statement, and her third oral recorded statement was harmful.

### D. Harm Analysis

The admission into evidence of a statement taken in violation of *Miranda* rights is constitutional error subject to harmless error review under Texas Rule of Appellate Procedure 44.2(a). *See* Tex.R.App. P. 44.2(a); *Jones,* 119 S.W.3d at 777. In such a case, reversal is required unless we determine beyond a reasonable doubt that the failure to suppress the statement did not contribute to the jury's verdict. Tex. R.App. P. 44.2(a); *Jones,* 119 S.W.3d at 777. If there is a reasonable likelihood the error materially affected the jurors' deliberations, the error is not harmless. *Jones,* 119 S.W.3d at 777. In conducting this analysis, we are required to "calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence." *Id.*

In the context of a *Miranda* violation, we must "'judge the magnitude of the error in light of the evidence as a whole to determine the degree of prejudice to the defendant resulting from the error.'" *Id.* (quoting *United States v. Polanco,* 93 F.3d 555, 562–63 (9th Cir.1996) (analyzing *Miranda–Elstad* error)). Therefore, we must assess the weight a juror would likely place upon the improperly admitted statements. *Jones,* 119 S.W.3d at 778. To conduct this inquiry in this case, we must assess the independent proof of appellant's participation in the crime. *See Jones,* 119 S.W.3d at 778. However, we must be mindful that "[a] defendant's statement, especially a statement implicating her in the commission of the charged offense, is unlike any other evidence that can be admitted against the defendant." *McCarthy v. State,* 65 S.W.3d 47, 55–56 (Tex.Crim. App.2001); *see also Arizona v. Fulminante,* 499 U.S. 279, 296, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991). As the Court of Criminal Appeals observed in *McCarthy,* "A confession is likely to leave an indelible impact on a jury." 65 S.W.3d at 56. Indeed, the court noted,

> [A] defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.... [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.

*Id.* (quoting *Fulminante,* 499 U.S. at 296, 111 S.Ct. at 1257).

Appellant was indicted, tried, and convicted of capital murder. A person commits capital murder if he intentionally or knowingly causes the death of an individual in the course of committing or attempting to commit robbery. TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003), § 19.03(a)(2) (Vernon Supp. 2009). A person commits the offense of robbery if, "in the course of committing theft ... he intentionally, knowingly, or recklessly causes bodily injury to another" or "intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." *Id.* § 29.02(a)(1)-(2) (Vernon 2003). A person commits the offense of aggravated robbery if, in the course of committing a robbery, he uses or exhibits a deadly weapon. *Id.* § 29.03(a)(2) (Vernon 2003). While mere presence at the scene of an offense does not make one a party to the offense, flight from the scene is circumstantial evidence of guilt. *See Eguia v. State,* 288 S.W.3d 1, 6–7 (Tex.App.-Houston [1st Dist.] 2008, no pet.) (citing *Harris v. State,* 645 S.W.2d 447, 457 (Tex.Crim. App.1983)).

The jury charge allowed appellant to be found guilty of capital murder either as a principal, a party, or a participant in a conspiracy that resulted in the death of Brady Davis. Specifically, the jury charge allowed the jury to find appellant guilty of capital murder if the evidence proved, beyond a reasonable doubt, (1) "that on the occasion in question [appellant] was in the course of committing or attempting to commit the felony offense of robbery of Brady Davis ... but also that [appellant] specifically intended to cause the death of Brady Davis, by shooting with a deadly weapon"; or (2) "that [appellant] with the intent to promote or assist in the commission of the offense of robbery ... solicited, encouraged, directed, aided, or attempted to aid Dexter Johnson and/or Keithron Fields in shooting Brady Davis, if she did, with the intention of thereby killing Brady Davis"; or (3) that appellant "entered into an agreement with Dexter Johnson and/or Keithron Fields to commit the felony offense of robbery of Brady Davis ... and

pursuant to that agreement they did carry out their conspiracy, and while in the course of committing said conspiracy, Dexter Johnson and/or Keithron Fields intentionally caused the death of Brady Davis by shooting with a deadly weapon, namely a firearm." The jury found appellant guilty of capital murder without specifying its grounds.

Virtually no evidence was admitted at trial that placed appellant at the scene of the Davis murder other than her three illegally obtained confessions. Moreover, even if there had been more evidence against appellant than there was, under the circumstances of this case—in which three improperly admitted statements provided all the details necessary to convict appellant of capital murder—I would still agree with the Court of Criminal Appeals' statement in *McCarthy,* that, "[r]egardless of whether there was, apart from appellant's statement, sufficient evidence to conclude that the outcome of the trial was proper, we find it impossible to say there is no reasonable likelihood that the State's use of appellant's statement[s] materially affected the jury's deliberations." 65 S.W.3d at 56.

I conclude it cannot be determined beyond a reasonable doubt that appellant's confession did not contribute to her conviction, and therefore I would hold that reversal is required. *See* Tex.R.App. P. 44.2(a).[7]

## CONCLUSION

I would reverse the judgment of the trial court and remand the cause for a new trial.

---

7. Because the foregoing matters are dispositive of this case, I would not reach appellant's fourth through seventh issues, arguing legal and factual sufficiency of the evidence to support appellant's conviction.